USCA1 Opinion

 

 July 18, 1996 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1001 BEVERLY RUTH D'APRILE, Plaintiff - Appellant, v. FLEET SERVICES CORP., Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ ____________________ Before Cyr, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Gertner,* District Judge. ______________ _____________________ Frank J. Manni, with whom John F. DiMeglio was on brief for ______________ ________________ appellant. Lynette Labinger, Roney & Labinger, Christopher M. Mulhearn ________________ ________________ _______________________ and Rodio & Brown on brief for Rhode Island Affiliate American _____________ Civil Liberties Union and Rhode Island Protection and Advocacy System, Inc., amici curiae. Cynthia M. Hiatt on brief for Rhode Island Commission for _________________ Human Rights, amicus curiae. Lincoln D. Almond, with whom Mark A. Pogue and Edwards & _________________ _____________ __________ Angell were on brief for appellee. ______ ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. ____________________ GERTNER, District Judge. Plaintiff Beverly Ruth GERTNER, District Judge. _______________ D'Aprile brought this action in the United States District for the District of Rhode Island against her former employer, defendant Fleet Services Corporation ("Fleet"). She charged Fleet with violation of the handicap discrimination provisions of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws  28-5-1, et seq., on account of Fleet's alleged refusal to ________ reasonably accommodate the symptoms she experienced from Multiple Sclerosis ("MS").1  MS is a degenerative nerve disorder which can produce symptoms ranging from fatigue and numbness to paralysis and death. The severity of symptoms is related in part to the amount of stress experienced by the patient. In D'Aprile's case, she alleges that her symptoms were sufficiently in abeyance that she was capable of performing her job as a Senior Systems Support Analyst. She contends, however, that she needed the accommodation of being permitted to work only a part-time schedule for a short time (one to two months) so that she could slowly reacclimate herself to full-time work. Her claim that Fleet refused to provide this accommodation constitutes the gravamen of her case.  On November 22, 1995, the district court granted Fleet's motion for summary judgment. The district court  ____________________ 1 R.I. Gen. Laws 28-5-7(1) generally makes it unlawful to refuse to hire, or to discriminate against an employee on the basis of handicap. R.I. Gen. Laws 28-5-7(1)(i)-(iii). In addition, the statute specifically makes it unlawful "to refuse to reasonably accommodate an employee's or prospective employee's handicap unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise, or business." R.I. Gen. Laws 28-5-7(1)(iv). concluded that summary judgment was mandated by our earlier decision in August v. Offices Unlimited, Inc., 981 F.2d 576 (1st ______ _______________________ Cir. 1992). Because we disagree that August mandates judgment ______ for the defendant in this case, we reverse. BACKGROUND BACKGROUND __________ In November 1991, D'Aprile commenced employment with Fleet on a full-time basis. In January of 1992, D'Aprile began to experience the first symptoms of MS, a numbness in her leg which lasted for four days. Then, in July of 1992, she began to experience numbness in the entire left side of her body, and took a medical leave of absence for the entire month of July. D'Aprile's symptoms recurred in October of 1992, at which time she was diagnosed with MS. As a result of her symptoms, D'Aprile was unable to travel to work from October 1, 1992 until January 31, 1993. In the beginning of this period of absence, during October and November, D'Aprile continued to work at home, and Fleet provided her with a computer to allow her to do so. By the end of November, however, D'Aprile's condition deteriorated to the point that she completely ceased working.  In January of 1993, D'Aprile's symptoms abated somewhat, and she expressed a desire to return to work. Her doctor advised her that she should return to a full-time position in stages, beginning with part-time work. Accordingly, D'Aprile later asked her supervisor, Debbie Sullivan, for permission to return on a part-time basis for a two month period. In -3- particular, she asked if she could work three days per week (taking Mondays and Fridays off) until she felt strong enough to resume a full-time schedule. She told Sullivan that she would take eight vacation days for the first month so that she could continue receiving a full-time salary. According to D'Aprile, Sullivan told her that her proposed arrangement sounded okay, and that she was willing to "work with" D'Aprile, but that she would have to get back to her about it after checking with Diane DeCosta, the Human Resources Manager. D'Aprile states that on January 19, 1993, Sullivan called her back and told her that it was against company policy for her to work part-time. D'Aprile then called Henry Korsiak, Sullivan's superior. Korsiak endorsed Sullivan's description of company policy. D'Aprile then asked Korsiak about another employee, Mary Gendreau, who had been permitted to return part- time after a maternity leave. Korsiak told D'Aprile that Gendreau had negotiated a "special deal" with her supervisor. Notwithstanding Fleet's refusal to approve D'Aprile's proposed part-time work schedule, she returned to work on February 1, 1993. After her return, she called Jan Wyant, who worked in Human Resources, and asked her if she could take off Friday, February 5th and Monday, February 8th. Wyant approved the absence, and told D'Aprile to take two personal days.  When D'Aprile did not come to work on Friday, February 5th, she called Korsiak. According to D'Aprile, Korsiak "screamed" at her, telling her that she had no right to go over -4- his head to get permission to take personal days. He told her, "You said that you were coming back for February 1st and you should be here, and I don't know why you're not here. And if you're not here, maybe you shouldn't bother coming back." D'Aprile states that she was very upset by Korsiak's response, and interpreted it as an ultimatum that she work full-time or lose her job. Despite Korsiak's harsh response, however, D'Aprile returned to work on the following Tuesday, and continued working a three day-a-week schedule during the months of February and March, 1993. As D'Aprile describes it, however, she only managed to achieve this result "not without a fight." She states that every time during the February-March period that she requested time off, the request would initially be denied by Debbie Sullivan, who took the position that accrued vacation time could only be used with a supervisor's approval. On each of these occasions, D'Aprile was forced to appeal to Jan Wyant, who approved each request.  This weekly pattern of requests for time off, denials by Sullivan and reluctant approvals by Wyant continued during the month of February and through most of March. At some point during this time, Korsiak and Sullivan indicated to D'Aprile that she had no more vacation time. D'Aprile eventually decided that she could no longer work under such conditions. Her physical condition had deteriorated, causing her to feel "very, very fatigued." After discussing the matter with her doctor, she -5- concluded that her symptoms had worsened due to the "stress and strain" produced by Fleet's refusal to approve her request for a part-time work schedule. On March 24, 1993, she returned to disability status. On March 25, 1993, the day after D'Aprile stopped working, she submitted a letter from her doctor stating that she was "unable to work at this time and should be placed on disability." As a result, D'Aprile received disability benefits under Fleet's short and long-term disability plans until January 21, 1995, when those benefits were terminated because Fleet's insurance carrier found that she was no longer totally disabled.  STANDARD OF REVIEW STANDARD OF REVIEW __________________ We review a grant of summary judgment de novo. Mesnick _______ _______ v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991). _____________________ Accordingly, we view the entire record in a light most favorable to the non-moving party, indulging all reasonable inferences in that party's favor. Id. The entry of summary judgment will be ___ upheld only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. ___ DISCUSSION DISCUSSION __________ -6- The district court entered judgment in favor of the defendant solely on the authority of August v. Offices Unlimited, ______ __________________ Inc., supra. In essence, the district court interpreted August ____ _____ ______ to stand for the proposition that a plaintiff is barred from claiming handicap discrimination if, after leaving her employment, she contends that she is "totally disabled" within the meaning of her employer's disability insurance policy. We think that August stands for a much narrower proposition. ______ The plaintiff in August was a furniture salesman who ______ began to suffer from symptoms of severe clinical depression. As a result of this depression, August asked for and received a six week paid leave of absence from his employer. At the end of the six week period, August advised his employer that he was not yet able to return to work. His doctor submitted a letter estimating that August would require an additional two to four weeks to recuperate. The employer told August that he would be permitted to take an additional two weeks as vacation, but that he would be expected to return to work at the end of that period. August, ______ 981 F.2d at 578. Shortly before his scheduled return, August's employer asked him if he was feeling "100 percent better." He replied, "I don't know if I'm 100 percent until I start working." His employer then advised him that the company would expect "110 percent" from him when he returned, and that he was "going to be under a lot more pressure than he was prior to leaving." Id. at ___ 579. August then requested that he be allowed to return on a -7- part-time schedule, but this was refused. He was told instead that if he was unable to work full-time, he should consider applying for disability benefits under the employer's insurance plan. Id. ___ The day after being refused a part-time schedule, and before his scheduled return to work, August submitted a claim under the company's disability plan. He asserted in his application for benefits that he had been totally and continuously disabled starting on a date forty-nine days earlier. Id. at 579. Thus, by August's own admission, he had been totally ___ disabled as of the date he requested and was refused the part- time schedule.  August brought suit under Massachusetts General Laws ch. 151B, a statute which, like the Rhode Island statute at issue here, prohibits employment discrimination against people with disabilities.2 August claimed that his employer had failed to  ____________________ 2 One difference between the two statutes is that the Massachusetts statute prohibits discrimination against "any person alleging to be a qualified handicapped person," while the Rhode Island law simply bars discrimination "because of" handicap, and requires the employer to "reasonably accommodate" such handicap. Compare Mass. Gen. Laws ch. 151B 4(16) with _______ ____ R.I. Gen. Laws 28-5-7. Moreover, the Rhode Island statute specifically provides that discrimination on the basis of handicap is unlawful, even if other, lawful, factors motivated the discriminatory practice. R.I. Gen. Laws 28-5-7.3. Amici Rhode Island Commission for Human Rights, the Rhode _____ Island Affiliate of the American Civil Liberties Union and Rhode Island Protection and Advocacy System, Inc. urge that the Rhode Island statute creates broader protections than the Massachusetts law, protecting even those who are not qualified to work from adverse actions motivated even in part by an employer's discriminatory animus. We need not decide this question here since, as we explain below, summary judgment is inappropriate -8- reasonably accommodate his handicap by refusing to permit a part- time work schedule. The district court granted summary judgment for the employer, and we affirmed. We concluded that "the record [was] fatally bereft of indication that August possessed the ability to perform his job." Id. at 581.  ___ Crucial to our conclusion in August was the fact that ______ August had declared himself to be totally disabled under his employer's disability plan as of the time he applied for a reasonable accommodation from his employer. Although the disability plan's definition of "totally disabled" was not in the record, we concluded that "[u]nder any definition of the term, August's declaration that he was 'totally disabled' means that he was not able to perform the essential functions of his job . . . with or without reasonable accommodations." Id. at 581. Since ___ August admitted that he was unable to work at the time he requested his part-time schedule, we concluded that he was not a "qualified handicapped person" and thus had failed to make out a prima facie case under the Massachusetts statute. Id. at 584. _____ _____ ___ Two facts distinguish D'Aprile's case and therefore require a different outcome. First, D'Aprile never claimed to have been totally disabled at the time she requested an accommodation from Fleet. It was not until after her requests for a formal part-time schedule had been refused, and after experiencing the stress resulting from her ad hoc part-time ______  ____________________ even on the issue of whether D'Aprile was otherwise qualified to work. -9- status, that she claims to have become totally disabled. The issue which concerned us in August, that a plaintiff would claim ______ that he was entitled to a reasonable accommodation at the same ___________ time he claimed to be unable to work at all, is absent here. In addition, we note that D'Aprile's application for disability benefits in this case may not have constituted the broad admission of incapacity that we construed such an application to be in August. Fleet's short-term disability ______ policy defines a "totally disabled" employee as one "who is unable to perform the material duties of his/her job for the entire regularly scheduled work week as the result of an illness or injury and requires the ongoing care of a physician. . ." Such a disabled employee who "is unable to work" is entitled to benefits. D'Aprile's contention, that she was unable to work because her employer refused to permit a temporary part-time schedule, is entirely consistent with her claim to have been "totally disabled" within the meaning of the policy. It does not constitute an admission that she had been unable to work with the accommodation of a part-time schedule prior to that point.  August simply stands for the proposition that the ______ plaintiff's ability to work with reasonable accommodation is an element of a handicap employment discrimination case under Massachusetts law. Under the particular facts of that case, we found that August's application for disability insurance, combined with his demonstrated inability to perform any work (before or after the requested accommodation) eliminated any -10- genuine issue as to his ability to work with reasonable accommodation. Since D'Aprile never claimed to have been totally disabled during the time she requested her accommodation, and demonstrated her ability to work with the accommodation she requested, the reasoning of August does not apply.  ______ CONCLUSION CONCLUSION __________ D'Aprile contends that the accommodation Fleet made -- permitting her to take vacation and personal days on an ad hoc ______ basis -- was not a reasonable one given the nature of her condition and its sensitivity to stress factors. She further asserts that she was capable of working part-time in the absence of additional stressors, and would have been able to continue her employment were it not for the hostile and non-cooperative response of her supervisors to her request for a modified schedule.  Given that D'Aprile did in fact work part-time for almost two months after her initial request, she has raised a genuine issue of material fact as to whether she could have continued even longer if Fleet had accommodated her as requested. D'Aprile's subsequent application for disability benefits after Fleet refused to accommodate her does not resolve this issue because it sheds no light on how D'Aprile would have fared had the accommodation been made.  -11- For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further ________ ________ proceedings consistent with this opinion. Costs to appellant. SO ORDERED. SO ORDERED. -12-