ALAN J. LABONTE *vs.* HUTCHINS & WHEELER.[1]

Suffolk. October 7, 1996. - May 5, 1997.

Present: WILKINS, C.J., ABRAMS, O'CONNOR, & FRIED, JJ.

*Anti-Discrimination Law,* Handicap, Termination of employment. *Estoppel.*
*Employment,* Discrimination, Termination. *Damages,* Emotional
distress, Punitive. *Words,* "Qualified handicapped person."

In an action asserting a claim based on handicap discrimination in employ-
ment, the plaintiff was not estopped from pursuing that claim because
he applied for and received disability benefits after being terminated
from his employment, where the plaintiff never claimed to have been
totally disabled during the time he was seeking a reasonable accom-
modation and where he demonstrated that he was quite able to perform
his duties had he been given a reasonable accommodation. [816-820]

In a handicap discrimination case, the evidence presented supported the
conclusion that the plaintiff was a qualified handicapped person, able to
perform the essential functions of his job provided his employer made a
reasonable accommodation for him, and the evidence was sufficient to
warrant the denial of the employer's motion for judgment notwithstand-
ing the verdict. [820-823]

In a handicap discrimination case, the jury reasonably could have concluded
that the evidence of depression the plaintiff suffered as a result of his
termination from employment was sufficient to warrant an award of
damages for emotional distress [823-824]; however, the award was exces-
sive based on the evidence presented and the matter was remanded for a
hearing on the amount of a remittitur [824-826].

A handicap discrimination case was remanded for reconsideration of the
punitive damages award in light of *BMW of N. Am.* v. *Gore,* 517 U.S.
559 (1996), decided after the trial and the hearing on the motion for
new trial. [826-827]

CIVIL ACTION commenced in the Superior Court Depart-
ment on September 11, 1992.

The case was tried before *Catherine A. White,* J.

The Supreme Judicial Court granted an application for
direct appellate review.

---

[1]James G. Wheeler and others, copartners doing business under the law
firm name and style of Hutchins & Wheeler. We shall refer to a single de-
fendant (law firm).

*Richard W. Renehan (Joshua M. Davis* with him) for the defendant.

*David Rapaport (Jerry E. Benezra* with him) for the plaintiff.

ABRAMS, J. The defendant, the law firm of Hutchins & Wheeler (law firm), appeals from a jury verdict in favor of the plaintiff, Alan J. Labonte, based on handicap discrimination. See G. L. c. 151B, § 4. The law firm argues that: (1) the plaintiff is estopped from pursuing his claim because he sought disability benefits; (2) the evidence was insufficient to withstand a motion for directed verdict; and (3) the judge erred in denying its motion for remittitur or a new trial based on excessive damages. We allowed the law firm's application for direct appellate review. We affirm the determination of liability. We remand the case to the Superior Court for further proceedings on the issue of damages.

1. *Facts.* In June, 1990, the plaintiff, Alan J. Labonte, was hired as the executive director of the law firm. When hired, he was informed that his job would have a "continuously high" stress level. He was told that he would be required to perform many functions, although the exact functions never were incorporated explicitly into a written job description. At the job interview the law firm implied that the hours would be long. The plaintiff was to receive $115,000 per year for his services.

The plaintiff, a Greenfield resident, took up residence in an apartment near the law firm. His family remained in Greenfield. The plaintiff stayed in Boston during the week and traveled to Greenfield on weekends to be with his family. After a year, the plaintiff bought a home in the Boston area so that his family could be with him. Various partners of the law firm knew of and assisted with the mechanics of the purchase of the home and none dissuaded him from making the purchase or gave any indication that his job was in jeopardy.

During the first year, the plaintiff created a timekeeping system that saved the law firm $13,000 per month, arranged for a better life insurance package for the attorneys, rearranged leasing agreements to save rental payments of $43,000, lowered client disbursement costs by $200,000, and devised a system to cut overtime expenses to save $40,000. In June, 1991, the plaintiff received an evaluation stating that the

partners were "very satisfied" with the work that he was doing. The plaintiff received a raise of $4,600 a year.[2]

Approximately one year after starting at the law firm, the plaintiff developed a limp. A partner at the law firm suggested that he visit a doctor who was a client of the law firm. The plaintiff did so. The plaintiff learned that he had multiple sclerosis. He was referred to a neurologist, who specialized in the disease.

After learning that the plaintiff had multiple sclerosis, the partners on the management committee began to shun him. Despite a request to do so by the plaintiff, the partners never communicated with the specialist to determine what measures could be taken to accommodate the plaintiff in light of his condition. The only effort made was to meet over lunch on one occasion with the plaintiff's referring doctor. The doctor told them to limit the amount of walking that the plaintiff would be required to do. He also stated that the plaintiff might need to rest during the day. The plaintiff continued to work long hours,[3] including taking on additional tasks assigned by the partners such as leading a search committee for a replacement for an employee who had left.

The partners at the law firm made no effort to move the plaintiff's office or to limit his need for walking. On one occasion, one partner did tell the plaintiff that he should go home if he was tired so that he would not wear himself out and then be ineffective. The partners continued to maintain a heavy work load for the plaintiff, and also pressured him to cancel a personal trip to Florida that he had planned in December, 1991. In January, 1992, the plaintiff was terminated by the law firm. With the exception of the one lunch meeting with the referring doctor, the partners never met with any of the plaintiff's doctors or the plaintiff himself prior to his termination to discuss whether reasonable accommodation to assist the plaintiff was possible. The reason given for his termination was poor work performance due to his disability. The law firm claimed that the plaintiff's thinking was not as "crisp" as it needed to be.

After being terminated, the plaintiff applied for and

---

[2]He also had received a Christmas bonus.

[3]The plaintiff's predecessor (and successor) in the role had spent only thirty-five to forty hours each week accomplishing most of the tasks that the plaintiff would be asked to assume.

received disability benefits from a law firm insurance policy, stating that he was "unable to work long hours in a stressful job; [and] need[ed a] flexible work schedule." As a result of being terminated, the plaintiff became very depressed and sought therapy. Soon after his termination, he began consulting for a hospital in the greater Boston area. By the fall of 1993, the plaintiff was enrolled in a doctoral program at Boston University, taking classes and teaching.

2. *Estoppel.* The law firm claims that the plaintiff is estopped from pursuing this discrimination claim because he sought disability benefits after being terminated by the law firm. The law firm asserts that a plaintiff claiming disability benefits admits that he is totally disabled and is unable to perform his job. Therefore, the plaintiff is not a "qualified handicapped person."[4] A majority of courts have rejected a defendant's claim that seeking benefits automatically disqualifies a plaintiff from pursuing a handicap discrimination claim.[5]

Courts are wary of allowing plaintiffs to play "fast and loose with the courts" by claiming to be too disabled to perform the functions of a job and also claiming that they were terminated from their positions despite being able to perform those same functions. See *McNemar* v. *Disney Store, Inc.,* 91 F.3d 610, 618 (3d Cir. 1996), cert denied, 117 S. Ct. 958 (1997). However, if the evidence creates a disputed issue of fact whether the handicapped person can perform the essential functions of the job, then estoppel is not appropriate. See *Pegues* v. *Emerson Elec. Co.,* 913 F. Supp. 976, 980-981 (N.D. Miss. 1996) (application for disability benefits does not "necessarily foreclose" a claim of handicap discrimination); *Parisi* v. *Jenkins,* 236 Ill. App. 3d 42 (1992); *Department of Transp.* v. *Grawe,* 113 Ill.

---

[4]To recover under Massachusetts discrimination law, a plaintiff must be a "qualified handicapped person." A "qualified handicapped person" is one who can perform the "essential functions" of his position given "reasonable accommodation." *Cox* v. *New England Tel. & Tel. Co.,* 414 Mass. 375, 381 (1993).

[5]Because our statutes in the area of employee discrimination law closely mirror the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (1994) (ADA), we look toward Federal courts to see how they have addressed this issue. Despite no obligation to follow the Federal case law in the area, see *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 441 (1995), a survey of the Federal case law enables us to review the rationale for adopting or rejecting the application of the doctrine of estoppel.

App. 3d 336 (1983); *Jishi* v. *General Motors Corp.*, 207 Mich. App. 429 (1994); *Paschke* v. *Retool Indus.*, 445 Mich. 502 (1994). Only one court has explicitly adopted a strict rule maintaining that a person filing for disability benefits is estopped from pursuing any claim for discrimination, solely because that person sought and received disability benefits. See *Garcia-Paz* v. *Swift Textiles, Inc.*, 873 F. Supp. 547, 557 (D. Kan. 1995).

Other "courts [applying estoppel] did not find it dispositive that the plaintiff had made representations of disability in order to receive benefits. Rather, some of the courts considered such representations as factors to be weighed in determining whether a fact question existed." *Morton* v. *GTE North, Inc.*, 922 F. Supp. 1169, 1182 (N.D. Tex. 1996) (rejecting the notion that cases other than *Garcia-Paz*, *supra*, apply estoppel based solely on a claim for disability benefits).[6]

Relying on *Beal* v. *Selectmen of Hingham*, 419 Mass. 535 (1995), and *August* v. *Offices Unlimited, Inc.*, 981 F.2d 576 (1st Cir. 1992), the law firm asserts that the plaintiff should be estopped from pursuing this action. We do not agree. In *Beal*, a police officer was on paid disability leave for two years after suffering severe injuries sustained in a head-on automobile collision while on duty. When ordered to return to duty, the officer claimed that she was "permanently and totally disabled." *Beal*, *supra* at 543. The officer was terminated and thereafter claimed handicap discrimination. *Id.* at 537. We concluded that her declaration of total disability on being asked to return to work was proof that she could not have performed the essential functions of the position. *Id.* at 539-543. We also noted that a police officer's job, even a desk job, necessitated the ability to react quickly in emergency situations and that the plaintiff's propensity to blackouts in stressful situations made her unable to perform the essential functions of the job. *Id.* at 542-543. These factors together eliminated any dispute as to whether the plaintiff could perform the essential functions of the job.

Similarly, in *August*, the plaintiff, a salesman, had taken a continuous leave of absence due to clinical depression. His six-week leave began on March 27, 1989, and was later

---

[6]Application of estoppel in this area has been sharply criticized. See Beaumont, This Estoppel Has Got to Stop: Judicial Estoppel and the Americans with Disabilities Act, 71 N.Y.U. L. Rev. 1529 (1996).

extended an additional two weeks to end on May 22, 1989. At a May 11 meeting, August expressed his concern over his ability to perform on a full-time basis and was told that a part-time schedule was inappropriate. Unsure of his ability to return to work, the plaintiff filed for disability benefits on May 12, 1989. *August, supra* at 578-579.

On May 25, 1989, August was terminated because "it [was] certainly unclear when and if [August would] be able to return to work." *Id.* at 579. He sought and received disability benefits for the rest of the year and renewed his claim in December, 1989; February, 1990; April, 1990; and June, 1990, on the basis that he was totally and continuously disabled. The application for benefits included a statement from the plaintiff's doctor that the plaintiff had been "totally disabled" since March, 1989. August brought suit claiming handicap discrimination. The court denied August relief because it stated that his declaration that he was "totally disabled" was an admission that he was unable to perform the essential functions of the job, even given reasonable accommodation. *Id.* at 581-583. He failed to provide evidence that he could perform the essential functions of the job given reasonable accommodation. *Id.* Thus, when the request for accommodations was made, August already had admitted to being "totally disabled" and not a qualified handicapped person.

The plaintiff points to *D'Aprile* v. *Fleet Servs. Corp.*, 92 F.3d 1 (1st Cir. 1996), as the analysis we should follow because it is the closest to his case. We agree. D'Aprile, a senior systems support analyst with multiple sclerosis, worked for two months on a flexible part-time schedule, using her vacation time to create a de facto accommodation. The plaintiff performed the essential functions of her job at a high level when allowed to use this schedule. When her vacation time elapsed, the employer denied her the opportunity to maintain the flexible schedule. She was terminated because she could not work a full-time weekly schedule and immediately filed for disability benefits. The employer argued that, based on the authority of *August*, the filing for disability benefits precluded the plaintiff from suing on the basis of handicap discrimination. The court disagreed.

The court noted that D'Aprile never claimed to be totally disabled during the time in which she requested her accom-

modation.[7] *D'Aprile, supra* at 4. Her application for disability benefits came only after her requests for accommodation were ignored. Unlike August, who had claimed "total disability" while seeking accommodation, D'Aprile did not seek disability benefits until after she had been terminated. Therefore, the court reasoned that, because "D'Aprile never claimed to have been totally disabled during the time she requested her accommodation, and demonstrated her ability to work with the accommodation she requested," the mere fact that she sought disability benefits did not preclude her from bringing a claim of handicap discrimination. *Id.* at 5.

The law firm asserts that "neither [the plaintiff] nor his doctors ever qualified their numerous statements to [the insurer]." This assertion is incorrect. On the form on which the plaintiff filed his claim for benefits, he stated that he was in need of a flexible work schedule. This request for accommodation, never considered by the law firm, was evidence that the plaintiff was not claiming to be totally disabled.[8] See *Ward* v. *Westvaco Corp.*, 859 F. Supp. 608, 615 (D. Mass. 1994) (plaintiff's statement on an application for disability benefits indicating that accommodation was necessary made estoppel inappropriate). Further, unlike *August* where no disputed factual issue existed as to whether the plaintiff was a "qualified handicapped person" based on a claim of total disability, the case at bar presented a contestable claim based on disputed issues of fact.[9]

In sum, there was evidence to show that the plaintiff was

[7]The United States Court of Appeals for the First Circuit also noted that D'Aprile had shown that she could perform the essential functions if she had been allowed to continue to use the part-time flexible schedule. *D'Aprile* v. *Fleet Servs. Corp.*, 92 F.3d 1, 5 (1st Cir. 1996). While the plaintiff never was given the opportunity to have reasonable accommodations to perform his job, the jury could have concluded from the evidence that he could have performed the essential functions of the job had reasonable accommodations been provided.

[8]A distinction from *Beal* v. *Selectmen of Hingham*, 419 Mass. 535 (1995), and *August* v. *Offices Unlimited, Inc.*, 981 F.2d 576 (1st Cir. 1992), is that plaintiffs who eliminate a disputable issue of fact by claiming total disability may lose the fight to pursue a discrimination claim. See *Leatherwood* v. *United Parcel Serv.*, 708 S.W.2d 396 (Tenn. Ct. App. 1985); *Grauer* v. *Occidental Life Ins. Co.*, 363 So. 2d 583 (Fla. Dist. Ct. App. 1978).

[9]Even if we were to accept the law firm's argument that the plaintiff's work performance was suffering greatly, he was terminated without being given the opportunity to work with reasonable accommodation.

capable of working a fifty-five hour week when allowed to utilize a flexible schedule and when his expected amount of walking was limited. He did so at Boston University after being terminated by the law firm. The person who filled his job at the law firm before and after the plaintiff devoted less time to the functions of the position of executive director than the plaintiff devotes to his current position. There was evidence that the plaintiff could have handled the time requirements necessary to perform the essential functions.

The plaintiff's evidence was that he was disabled to perform the job without reasonable accommodation, but quite able to perform the job given some reasonable accommodation. The plaintiff sought an office near the elevators and flexible working hours. In these circumstances, estoppel is inappropriate. See, e.g., *D'Aprile, supra* at 4-5; *Mohamed* v. *Marriott Int'l, Inc.*, 944 F. Supp. 277 (S.D.N.Y. 1996). We conclude that the judge did not err in denying the law firm's claim that the plaintiff was estopped from pursuing a claim under G. L. c. 151B, § 4, by filing for disability benefits.

3. *Sufficiency of evidence.* The jury concluded that the law firm terminated the plaintiff, a qualified handicapped person, solely because of his handicap. We start with the proposition that taking the question out of the jury's hands is disfavored in the context of discrimination cases based on disparate treatment[10] because the ultimate issue is often that of intent, and is a factual question. *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437 (1995), citing *Brunner* v. *Stone & Webster Eng'g Corp.*, 413 Mass. 698, 705 (1992). See *Flesner* v. *Technical Communication Corp.*, 410 Mass. 805, 809 (1991) ("where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate").

Noting this preference for submitting the question to the jury, when we review the entry of a judgment notwithstanding the verdict, we view the evidence in the light most favor-

---

[10]We have recognized a difference between cases of disparate impact and cases of disparate treatment. *Smith College* v. *Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 227 (1978). The two types of cases place different burdens on the employee trying to prove a case of discrimination against the employer. See *Brunner* v. *Stone & Webster Eng'g Corp.*, 413 Mass. 698, 699-700 (1992). The case before us is one of disparate treatment.

able to the plaintiff and disregard evidence favorable to the law firm. *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982); *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). A jury verdict must be sustained if a plaintiff has presented any evidence from which the jury reasonably could have arrived at that verdict.

4. *Three-stage order of proof in discrimination cases.* General Laws c. 151B, § 4, provides in relevant part: "It shall be an unlawful practice . . . [f]or any employer, personally or through an agent, to dismiss from employment . . . or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business."

In disparate treatment cases, there is a three-stage order of proof, *Blare, supra* at 440-445, adopted from the approach taken by the Federal courts based on an analogous statute. *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 (1973). In the first stage, the burden is placed on the plaintiff to show by a preponderance of the evidence a prima facie case of discrimination. *Blare, supra* at 440-445. Massachusetts has adopted a flexible approach to this framework, acknowledging that "the facts necessary to establish prima facie case of discrimination will vary depending on [the] situation." *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 544 (1995).

To establish the prima facie case of unlawful employment discrimination on the basis of handicap pursuant to G. L. c. 151B, a plaintiff who has been terminated from employment must show that: (1) he suffers from a handicap; (2) he is a "qualified handicapped person"; and (3) he was fired solely because of his handicap. *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55, 60 (1995); *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375, 383 (1993).

Once a prima facie case is made, the burden shifts to the law firm to offer a legitimate nondiscriminatory reason for its action. A plaintiff could still prevail by showing that the reason given by the employer is merely a pretext for discrimination. The law firm consolidates the steps by offering that its reason for termination was that the plaintiff's disability made him unable to perform the essential functions of the job.

A "qualified handicapped person" is someone who can perform the "essential functions" of the job in question, provided that the employer makes "reasonable accommodation" for that employee. See *School Bd. of Nassau County* v. *Arline*, 480 U.S. 273, 287 n.17 (1987); *Garrity, supra* at 61-62.[11] The law firm argues that the plaintiff is not a "qualified handicapped person."[12] While the law firm presented some evidence to the contrary, the evidence and the inferences in the light most favorable to the plaintiff support the conclusion that the plaintiff could perform the essential functions of the job with reasonable accommodation.

No official job description for the position of executive director was offered in evidence. The law firm concedes that each person who had been in a position similar to the plaintiff had performed slightly different functions depending on the needs of the law firm at that time. Therefore, there is no clearly defined list of essential functions that the plaintiff must prove that he can perform. Compare *Cox* v. *New England Tel. & Tel. Co., supra* at 385-386 (recognizing that climbing a certain type of telephone pole was an essential function of being a splice service technician).

The jury heard evidence from a number of witnesses on the issue of what the job entailed. Based on the evidence, in the light most favorable to the plaintiff, the jury could have determined that the essential functions were the preparation of financial reports and prodding attorneys to collect monies from their clients with the assistance of a managing partner. A reasonable jury could conclude that the plaintiff was capable of fulfilling these functions, had he been given a flexible work schedule and an office near the elevators.

The law firm claims that whether a certain function is an "essential function" is solely the employer's judgment. That judgment is tested by relevant guidelines such as the work experience of previous incumbents and the current work experience of incumbents in the same or similar jobs. See *Cox, supra* at 383-384 ("essential function" determined by more than an employer's job description). See also *Hall* v. *United*

---

[11]There is also a requirement that any accommodations made by the employer not impose an "undue hardship." *Garrity* v. *United Airlines, Inc.,* 421 Mass. 55, 62 (1995).

[12]There is no disagreement between the parties that the plaintiff suffers from multiple sclerosis and is therefore handicapped. Thus, the first prong is fulfilled.

*States Postal Serv.*, 857 F.2d 1073, 1079-1080 (6th Cir. 1988) (stating that an employer's job description not sole factor determining whether function is essential); 29 C.F.R. § 1630.2(n) (1996) (regulations to implement the equal opportunity provisions of ADA).[13] Here, the partner who took over the responsibilities of the position after the plaintiff's termination was able to complete the essential functions of the job in thirty-five to forty hours a week. The jurors were entitled to weigh that evidence in their determination of what were the essential functions of the position.[14]

According to the law firm, the plaintiff was told that he was terminated because his thinking was not as "crisp" as it needed to be. That evidence was contradicted by evidence presented by the plaintiff. The partner who worked closely with the plaintiff was unaware of any dissatisfaction with the work that the plaintiff had been doing. The evidence was sufficient to withstand the motion for direct verdict and for judgment n.o.v.[15]

5. *Damages.* a. *Damages for emotional distress.* The law

---

[13]The Federal guidelines can be used to guide Massachusetts in interpreting G. L. c. 151B. *Beal, supra* at 539-543. See 29 C.F.R. § 1630.2(n) (1996) ("Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs").

[14]Regardless of the exact duties of the position, the law firm argues that evidence should have led the jury to conclude that the plaintiff was incapable of performing his job duties even with accommodation. Provided that there is evidence that a jury could believe that the plaintiff could have performed the essential functions of his job given reasonable accommodations, a motion for directed verdict or a judgment n.o.v. is inappropriate. See *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309 (1993); *Talbert Trading Co.* v. *Massachusetts Comm'n Against Discrimination*, 37 Mass. App. Ct. 56 (1994).

[15]During cross-examination, a specialist, who had been treating the plaintiff, remarked that, at the time he examined him, the plaintiff was incapable of performing the job even with reasonable accommodation. On redirect, the specialist clarified his testimony and stated that, without the depression caused by the termination, the plaintiff could have worked at least forty hours a week and performed his usual functions. In considering the sufficiency of the evidence in the light most favorable to the plaintiff, we accept the testimony on redirect examination.

firm argues that there is insufficient evidence to sustain the jury verdict for emotional distress. We disagree. " '[T]he finding of [discrimination] alone permit[s] the inference of emotional distress as a normal adjunct of the [employer's] actions.' It necessarily follows that in c. 151B cases an award of emotional distress damages can be sustained even in the absence of physical injury or psychiatric consultation." *Buckley Nursing Home, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 20 Mass. App. Ct. 172, 182 (1985), quoting *Bournewood Hosp., Inc.* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 303, 317 (1976).

There was evidence that the plaintiff was depressed after his termination and further that his confidence was shattered by being terminated by those of whom he had thought so highly. Further, one of the plaintiff's doctors said that the plaintiff was depressed as a result of being terminated. He also testified on redirect examination that, but for this depression, the plaintiff could have performed at a high level. Therefore, the jury reasonably could have concluded that the depression caused by the termination was sufficient to warrant damages for emotional distress.

The law firm next contends that the $550,000 award for emotional distress is excessive based on the evidence presented. We agree. "[A]n award of damages must stand unless to make it or to permit it to stand was an abuse of discretion on the part of the court below, amounting to an error of law." *Mirageas* v. *Massachusetts Bay Transp. Auth.*, 391 Mass. 815, 822 (1984). It is an error of law if "the damages awarded were greatly disproportionate to the injury proven or represented a miscarriage of justice." *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 787 (1975). See, e.g., *Walnut Creek Manor* v. *Fair Employment & Hous. Comm'n*, 54 Cal. 3d 245, 263 (1991), quoting Department of Fair Employment & Hous. v. Ambylo Enters., Inc., Decision No. 82-06 (1982) (acknowledging that "there is little in legal authority to guide [the proper standard for ruling an emotional distress award excessive], for the reason that '[i]t has traditionally been left to the trier of fact to assess the degree of harm suffered and to fix a monetary amount as just compensation therefor' "). *Bartholomew* v. *Schweizer*, 217 Conn. 671, 687 (1991), quoting *Mather* v. *Griffin Hosp.*, 207 Conn. 125, 139 (1988) (stating that "[t]he size of the verdict alone does not determine

whether it is excessive. 'The only practical test to apply to this verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption' ").[16]

Determining whether damages are excessive is difficult because "[c]laims for damages for emotional distress are inherently difficult to prove with certainty, to rebut, and to evaluate." *Keohane* v. *Stewart*, 882 P.2d 1293, 1305 (Colo. 1994), cert. denied, 513 U.S. 1127 (1995). As a result, Iowa, although disfavoring the comparison of an award from a case at bar with awards from other similar cases, has nonetheless used comparison as a tool to determine excessiveness. See *Hampton* v. *Iowa Civil Rights Comm'n*, 554 N.W.2d 532 (Iowa 1996).

The plaintiff did suffer from depression and sought counseling for that depression from a therapist; however, his depression abated as he found a new job and began taking classes at Boston University. He was not hospitalized and never took medication to combat his depression. After being terminated, the plaintiff told his internist that he was "very motivated" to move on to new projects. He also expressed to another of his doctors that he was relieved to be free of the emotional stress of his position. Stripped of punitive aspects, this award does not relate reasonably to the emotional distress suffered by the

---

[16]Courts in other States have expressed similar views. See, e.g., *Keohane* v. *Stewart*, 882 P.2d 1293, 1305 (Colo. 1994), cert. denied, 513 U.S. 1127 (1995) (stating that jury's award "should not be overturned unless [it] is grossly and manifestly excessive"); *Mouchette* v. *Board of Educ., Oakland Unified Sch. Dist.*, 217 Cal. App. 3d 303, 316 (1990), and cases cited ("if after reviewing the record favorably to the judgment, the award is so grossly disproportionate to the harm suffered as to raise a presumption that it is the result of passion or prejudice"). *Spragg* v. *Shore Care*, 293 N.J. Super. 33, 63 (1996) ("In assessing emotional damages, no precise measurement can be made between a monetary amount and the degree of one's physical or mental suffering. Rather, the only method for evaluating damages is to identify such an amount as reasonable persons estimate to be fair compensation" and that an award amount should be upheld unless the award "is so excessive as to represent a miscarriage of justice in light of the evidence presented").

plaintiff. His depression, while real and significant, did not rise to the level awarded by the jury.[17]

We conclude that a remittitur is required. *Davidson* v. *Robie*, 345 Mass. 333 (1963). Accordingly, this issue is remanded to the Superior Court for a hearing on the amount of remittitur. After hearing, the judge should determine the amount to be remitted or order a new trial on damages. See Mass. R. Civ. P. 50 (c), 365 Mass. 814 (1974); Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974); *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 657-662 (1978).

b. *Punitive damages.* The law firm also maintains that the award for punitive damages is excessive. There is no legislative cap on the punitive damages under G. L. c. 151B for handicap discrimination. Common law and constitutional principles mandate that courts review the amount to ensure that it is reasonable and not simply a criminal penalty. See, e.g., *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 15 (1991); *Honda Motor Co.* v. *Oberg*, 512 U.S. 415 (1994). The Supreme Court has set forth some factors which courts may use in analyzing a punitive damage award for excessiveness. See *BMW of N. Am.* v. *Gore*, 517 U.S. 559 (1996). Because the *BMW of N. Am.* case was decided after the trial and after hearing on the motion for new trial in this case, we conclude that there should be a rehearing on the defendant's motion for remittitur in light of the factors set forth in *BMW of N. Am.*

The majority opinion in *BMW of N. Am.*, *supra*, held that three main factors should be considered in determining if a punitive damage award is excessive: "the degree of reprehensibility of the defendant's conduct," the ratio of the punitive damage award to the "actual harm inflicted on the plaintiff," with a comparison of "the punitive damages award and the civil or criminal penalties that could be imposed for compar-

---

[17]The award also greatly exceeds emotional distress awards in similar cases. See *Cain* v. *Hyatt*, 734 F. Supp. 671 (E.D. Pa. 1990) (awarding $50,000 after termination by a law firm for a plaintiff who was diagnosed with AIDS in a case involving more egregious facts than are present here); *Brown* v. *Trustees of Boston Univ.*, 674 F. Supp. 393, 394-395 (D. Mass. 1987), aff'd in part, vacated in part, 891 F.2d 337 (1st Cir. 1989), cert. denied, 496 U.S. 937 (1990) (awarding $15,000 for depression after termination based on discrimination). We emphasize that, while we do not rely on comparisons in arriving at our conclusion, the fact that this jury award does greatly exceed other awards in similar cases buttresses our result.

able misconduct." *BMW of N. Am., supra* at 575, 580, 583. Where, as here, there is no cap on punitive damages, a judge or an appellate court must scrutinize the relationship between actual damages and the award of punitive damages. See *Browning-Ferris Indus. of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U.S. 257, 281 (1989) (Brennan, J., concurring) (stating that in the absence of a cap by the Legislature, punitive damages may be subject to closer scrutiny). "[A] punitive sanction that is tantamount to a severe criminal penalty [is impermissible]." See *BMW of N. Am., supra* at 585.

The concurrence in the *BMW of N. Am.* case discusses other standards to be applied and noted that the Alabama Supreme Court had not applied these standards in upholding the award in that case. *Id.* at 589 (Breyer, J., concurring). We note that some of the other factors set forth in the concurring opinion may assist the trial judge in reconsidering a punitive damage award. In reviewing punitive damages, the judge may consider the following criteria: a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred; a reasonable relationship to the degree of reprehensibility of the defendant's conduct; removal of the profit of an illegal activity and be in excess of it so that the defendant recognizes a loss; factoring in of the financial position of the defendant; factoring in of the costs of litigation and encourage plaintiffs to bring wrongdoers to trial; an examination whether criminal sanctions have been imposed; an examination whether other civil actions have been filed against the same defendant. *BMW of N. Am., supra* at 589-592.

6. *Conclusion.* The case is remanded to the Superior Court for further proceedings on the issue of remittitur or a new trial on damages on the emotional distress claim and a rehearing of the law firm's motion for remittitur or new trial on punitive damages in light of the standards set forth in *BMW of N. Am.*

*So ordered.*