Cowin, J.
INTRODUCTION
The defendants, Carney Hospital Corporation (Carney or the Hospital), Dennis Gada, Sister Kathleen Natwin, Thomas Walsh, and Mark Duro (the defendants) have moved for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur pursuant to Mass.R.Civ.P. 50 and 59. Under Mass.R.Civ.P. 50(a), the Court took this motion with leave reserved. The defendants claim that 1) the jury’s verdict is not supported by the evidence at trial; 2) the verdict should be reversed because of the prejudicial effect of, and “constitutional problems associated with” the evidence that was admitted regarding Catholic teachings on homosexuality; and 3) the lack of legal or evidentiary basis for the jury’s damages award. For the reasons discussed below, the Court denies the defendants motion.
BACKGROUND
This case was essentially a claim for sexual orientation discrimination in violation of G.L.c. 15 IB. The plaintiff, a former employee of Carney, claimed that he was wrongfully discharged from employment by the Hospital because of “sexual orientation discrimination.” Plaintiffs claims were submitted to the juiy on two theories: discrimination and interference with advantageous relations.[1] A jury verdict was returned against the Hospital on plaintiffs claim for sexual orientation discrimination and against defendants Gada, Natwin, Walsh and Duro for aiding and abetting discrimination and against Walsh and Duro for intentional interference with advantageous relations.
The juiy awarded plaintiff $625,000 in compensatory damages and a total of $650,000 in punitive damages. The punitive damages award consisted of $625,000 against the Hospital; $5,000 against defendant Gada; $5,000 against defendant Natwin; and $7,500 each against defendants Walsh and Duro.
DISCUSSION
A motion for judgment notwithstanding the verdict under Mass.R.Civ.P. 50(b) is to be granted where the evidence presented at trial, viewed in the light most favorable to the plaintiff, was insufficient to warrant an inference that the defendant acted unlawfully. Barry v. Beverly Enterprises-Massachusetts, Inc., 418 Mass. 590, 591 (1994); Upham v. Chateau de Ville Dinner Theater, Inc., 380 Mass. 350, 351 (1980). The court also has broad discretion under Mass.R.Civ.P. 59 to allow a motion for a new trial. Galvin v. Welch Manufacturing Co., 382 Mass. 340, 343 (1981).
1. Defendants’ initial claim is that plaintiff exploited anti-Catholic sentiment at trial. The plaintiffs allegedly pursued this tactic by seeking to remove Catholics from the jury. In support of this contention, defendants claim that the Court, at plaintiffs request and over the defendants’ objection, read the following voir dire question to the juiy venire: “Would you tend to believe the testimony of a Catholic nun simply because of her position?” The jurors who answered this question in the affirmative were called to sidebar and the two who indicated after a colloquy that they would believe a nun simply because of her position were excused.[2],[3] Trial Transcript, Vol. 1, at 98, 116.
Striking a juror for religious affiliation is clearly impermissible under the Equal Protection Clause. See Batson v. Kentucky, 476 U.S. 79, 90 (1986). Religion, like gender and race, is a suspect classification. See Commonwealth v. Carleton, 773, 774-75 (1994). The defendants now claim that the juiy should not have been asked the voir dire question concerning Catholic nuns. The short answer to this argument is that the defendants did not make a timely objection to said voir dire question. They did not object to the question during a preliminary hearing held immediately prior to the start of the trial during which the Court stated that it would ask this question of the venire. See Trial Transcript, Vol 1, at 1-3, 1-5. And the defendants did not object to the voir dire question at the time it was posed to the venire. See Trial Transcript, Vol. 1, at 1-92. They only objected to it after the voir dire questions had been read and one juror had come to sidebar in response to the question. Trial Transcript, Vol. 1, *576 at 99-101. At that time, the Court stated: “you didn’t say that to me. You didn’t argue that when I announced at the beginning the questions I was going to ask ... I am ruling this is coming in too late because I have already asked the question and this objection to my knowledge was not presented to me before. And in any event, ... I have asked the question. There is nothing I can do at this point.” The defendants may not sit by while voir dire questions are put to the jury without voicing their objection and then raise the objection later.[4]
Even if, however, the defendants’ objection were timely, the objection was properly overruled. It would be the height of impracticality not to accept the reality that some jurors might be motivated to believe the testimony of a nun simply because she is a nun. The assignment of additional weight to testimony due to a witness’s status in life is improper and the court should uncover such prejudice if it exists. The subject question is no more offensive than the question commonly asked jurors whether they would tend to believe or disbelieve a police officer simply because the person is a police officer. That the inquiry in this case involves the religion of a person does not render the question impermissible from a constitutional viewpoint. The fact of religion is incidental; it is the attempt to weed out partiality on the part of the venire that is the key issue. The cause of the bias must be discerned; if such partiality happens to involve religion rather than professional status, the question is not thereby rendered impermissible.[5]
2. The defendants further claim that alleged efforts by the plaintiff to exploit anti-Catholic sentiment violated First Amendment principles, thereby penalizing defendants for their Catholicism or for their association with a Catholic institution. During the trial, the plaintiff cross-examined Sister Kathleen Natwin regarding her support of various church writings indicating that homosexuals cannot enter the “Kingdom of God.” Defendants claim that this was an impermissible inquiry into Sister Natwin’s religious beliefs because the courts cannot inquire about people’s religious beliefs. See Pielech v. Massasoit Greyhound, Inc., 423 Mass. 534 (1996), cert. denied, 117 S.Ct. 1280 (1997). This is not an accurate statement of the law.
In Pielech, the Supreme Judicial Court held that G.L.c. 15IB, §4(1A), violated the First Amendment’s Establishment Clause by involving the judiciary in disputes concerning religious doctrine. The Court stated, at 542: “We conclude that G.L.c. 151B, §4(1A), construed as we have concluded it must be construed, would require our courts in this case to determine what actions and beliefs are required of adherents to the Roman Catholic faith.” The defendants claim that by presenting evidence of Catholic teachings concerning homosexuality, plaintiffs counsel was requesting the jury to determine what beliefs concerning homosexuality are required of adherents to the Catholic faith. Thus, argue the defendants, the jury was placed in much the same position as the trial court in Pielech; the jury was required to be an arbiter of canon law.
The defendants misconstrue Pielech. Pielech held that the courts were not to be involved in determining matters of church doctrine. The case was decided, however, in the context of a doctrinal dispute: the Superior Court judge had been asked to decide what Catholic doctrine required.
In the present case, neither the Court nor the jury were called upon to adjudicate the requirements of Catholic dogma or to resolve any doctrinal dispute. The evidence regarding Catholic doctrine was presented to aid the juiy in determining whether Sister Kathleen Natwin, a (if not the), key participant in the termination of the plaintiffs employment, was influenced by her state of mind concerning the requirements of Catholic dogma. The jury was only asked to decide whether religious beliefs had a part in causing an unlawful action. This is permissible inquiry. It is, in fact, necessary inquiry in the adjudication of a religious discrimination case. The jury was not asked to decide what Catholic theology was on the subject (which was the question in Pielech); rather, the jury was asked to determine whether the Sister was motivated by her religious beliefs to act illegally. This is the iype of inquiry that the Supreme Judicial Court indicated in Pielech would be proper. The illogical result of the defendants’ position is that if an employer acts under the perception that his or her religion requires such an act, the employer has rendered itself immune from suit under the First Amendment’s Establishment Clause.
The questioning regarding religion was not inflammatory and unduly prejudicial. The Court weighed the probative value of these questions against the prejudicial effect and concluded that the probative value outweighed the prejudice. See Green v. Richmond, 369 Mass. 47, 59-60 (1975). I found and continue to believe that there was no implication that the questioning was conducted for anything other than for the proper purpose of attempting to demonstrate that there was an improper motivation for the firing.
3. The defendants also claim that the jury damages award is excessive and that a remittitur or new trial should be ordered. The Court declines to do either. The defendants’ primary argument is that the front pay award (an award for damages not yet suffered) by the jury is improper as front pay damages in Massachusetts are an equitable remedy to be determined by the court. This is incorrect. Front pay damages are to be determined by the jury in Massachusetts. See Conway v. Electro Switch Corporation, 402 Mass. 385, 387 (1988) (front pay is a component of traditional tort damages subject to jury determination as long as there is a jury claim). See also Handrahan v. Red Roof Inns, Inc., 43 Mass.App.Ct. 13 (1997).
*577 The defendants also argue that the front pay award is unreasonable and excessive and not based upon the evidence. Defendants argue that the award was speculative because plaintiffs front pay award covers 25 years, from 1996 to 2021, when plaintiff becomes 65. Defendants maintain that the evidence established a strong likelihood that plaintiff, had he not been terminated, would have left Carney in any event, perhaps even before the date of trial. In this regard, the defendants argue that the plaintiffs expert, Dr. Alan McCausland, testified that given the minimal salary increases awarded to Carney employees from 1992 to 1996, it was likely plaintiff would have sought employment elsewhere if he had remained in Carney’s employ after 1991. Also, defendants note plaintiffs prior transient employment history, that he had never stayed in one job for more than a few years. Thus, defendants claim, there is a question whether plaintiff is entitled to any front pay at all and certainly not in the amount awarded by the jury.
The defendants maintain that the award violates case law that cautions against the inherent speculative nature of long-term front pay awards. Further, they argue that when front pay damages are awarded, they are ordinarily limited to a few years. See Vance v. Southern Bell Telephone & Telegraph Co., 672 F.Sup. 1408, 1416 (M.D. Fla. 1987), rev’d in part on other grounds, 863 F.2d 1503 (11th Cir. 1989) (27 year award unreasonable); Dominic v. Consolidated Edison Co. of New York, Inc., 652 F.Sup. 815, 820 (S.D.N.Y. 1986), affd, 822 F.2d 1249 (2d Cir. 1987) (18 years of front pay inappropriate given plaintiffs outstanding credentials); Snow v. The Pillsbury Co., 650 F.Sup. 299, 300 (D.Minn. 1986) (9 years of front pay inappropriate); Kumar v. Board of Trustees of the University of Massachusetts, 566 F.Sup. 1299, 1328-29 (D.Mass. 1983), rev’d on other grounds, 774 F.2d 1 (1st Cir. 1985) (request for lifetime front pay award rejected); Crabtree v. Baptist Hospital of Gadsden, Inc., 45 F.E.P. cases (BNA) 1670, 1679 (D.Ala. 1983), rev’d in part on the grounds, 749 F.2d 1501 (11th Cir. 1985) (lifetime front pay award would be unworkable and could result in a windfall to plaintiff). Defendants maintain that twenty-five years of front pay damages should not be awarded to a plaintiff with an extremely transient history who most likely would have left his employer voluntarily within a few years.
In considering a remittitur, “a judge has no right to set aside a verdict merely because [the judge] . . . would have assessed the damages in a different amount.” Solimene v. B. Grauel & Co., 399 Mass. 790, 803 (1987). A damages award should not be disturbed if the jury could “honestly and fairly” have reached the award. Id. Initially, it is noted that there is no basis to determine the amount the jury awarded for front pay. Thus, the defendants’ assumption that the front pay award must account for a “substantial amount” of the verdict is speculative. In any event, the defendants have waived this issue. The jury returned a special verdict, see Mass.R.Civ.P. 49(a). "If in doing so the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the juiy.” Mass.R.Civ.P. 49(a). The Court here inquired whether the parties wished the jurors to be instructed to distinguish between front pay and back pay and neither party so requested. The Court then indicated that it would instruct the jury to provide a single value for compensatory damages, if any, and no party raised an objection. See Trial Transcript, Vol. 11, at 186-87. Having not objected to this procedure, the defendants will not now be heard to complain that the jury was not asked to itemize the verdict. See International Fidelity Insurance Company v. Wilson, 387 Mass. 841, 852 (1983) (‘To preserve his right under Mass.R.Civ.P. 49(a), a party must lodge an objection to the omission of any issue on the special questions before the jury retires”). See also Malden v. Breslin, 34 Mass.App.Ct. 258, 263 (1993). Also, it is noted that the defendants have not cited any Massachusetts cases on the subject of limiting front pay damages to a short period. Despite presenting a long list of cases as support for their position, there is not one Massachusetts case listed on the subject.[6]
Moreover, if an attempt is made to divide the $650,000 of compensatory damages into its component parts, it becomes clear that the front pay award was not excessive. There was no evidence that plaintiff definitely would have left his job at the Hospital. It is true that Carney offered only minimal salary increases during the years 1992-96. Implicit in the jury finding is that the plaintiff would have stayed at the Hospital, and the question is whether the evidence warranted that finding. There is no evidence that compels the finding that he would have left the Hospital. In addition, even though there was evidence that the plaintiff would have sought employment elsewhere if he had voluntarily left Carney, it is totally speculative that he would have obtained such employment.
The evidence was that the plaintiff had been earning a salary of approximately $50,000 when he was terminated by the Hospital in 1991. At his current job, in 1996, he was earning $32,000 a year. There was evidence that the plaintiff believed, and was led to expect, that he would become a supervisor at Carney (thus earning approximately $70,000 a year) shortly after the time he was terminated. The jury could have credited this testimony and could have believed therefore that the plaintiff would have earned this additional money. Accordingly, they could have found losses of approximately $38,000 for each of five years. This yields a total loss of front pay of $190,000. A front pay award of $190,000 was well-grounded in the evidence.
*578 4. Defendants also attack the emotional distress damages as excessive. Aside from the fact that the defendants waived the right to parse the verdict, assuming as above, the award for front pay is $190,000. Evidence supported an award of $100,000 for back pay and there was also evidence supporting $25,000 for incidental losses to plaintiffs property. These amounts total $315,000, leaving $335,000 for emotional distress damages. There was evidence that would support an award of that amount. Plaintiff testified that he had become emotionally distraught, was “devastated,” had crying spells, lost twenly-one pounds in three and one-half weeks, suffered migraines, could not function normally and was undergoing professional care beyond that which he could afford.[7] He was seeing a psychiatrist two or three times a week for the first few weeks. He also saw a psychologist. Trial Transcript Vol. 2, at 22; Vol. 3, at 31-33, 44, 51, 157-58, 166-167. Thus, the jury could have determined that the mental state caused by the termination was sufficient to warrant substantial emotional distress damage. In addition, the jury was carefully instructed as to emotional distress damages. See Trial Transcript, Vol. 11, at 11-268-269.
Further, as the Court stated in Labonte v. Hutchins & Wheeler, 424 Mass. 813 (1997), at 825: “ ‘[T]he finding of [discrimination] alone permitfs] the inference of emotional distress as a normal adjunct of the [employer’s] actions.’ It necessarily follows that in c. 15IB cases an award of emotional distress damages can be sustained even in the absence of physical injury or psychiatric consultation.” [Citations omitted.]
The defendants seek to compare the plaintiffs damages unfavorably with other awards in comparable cases. The short answer to this is that the award in this case was warranted by the evidence. Further, there is no way to compare the award in one case to the award made in another case based upon totally different evidence. Although the award in this case is close to the plausible outer limits, it is supported by the evidence.
5. An additional defense argument is that the jury did not abide by the Court’s instruction that, if any assumptions made by an expert witness were shown to be erroneous, such expert’s testimony should be disregarded. Defendants maintain that in view of this instruction the jury should have placed little, if any, reliance upon the plaintiffs expert economist, Dr. McCausland. His testimony, say defendants, relied substantially on a significant, misplaced assumption, that is, he assumed that if plaintiff had stayed at Carney Hospital from 1991 to 1996, he would have received substantial annual increases of up to 10%. On cross-examination, when Dr. McCausland was presented with the assumption that the employees at Carney during that time period actually were given annual raises of only 3% and in certain years no increases at all, McCausland admitted that if the lower raises were a reality his assumption was incorrect.
Defendants argue that this testimony permits no other conclusion than that McCausland’s calculations rested on at least one significant, erroneous assumption and should therefore have been discarded by the juiy.
The defendants’ argument fails, however, because no evidence was ever introduced that annual raises at Carney were limited to only 3%. The defendants’ expert testified: “I was provided information which I understand there will be subsequent testimony on that in 1992 the increase . . . was one percent. In 1993 and 1994 there were no increases ... In 1995 there was a 3 percent increase and in 1996 there was a two and-a-half percent increase.” Trial Transcript, Vol. X, at 10-34-35. There never was such subsequent testimony. Thus, there was some hearsay as to what the increases were.
Accordingly, the jury heard the plaintiffs expert and they heard the testimony of the defendants’ expert and the jury rendered its decision. The damages award the jury reached was based on the evidence. The jury presumably gave whatever weight it thought was appropriate to each of the experts. The Court cannot speculate as to what weight the juiy accorded to the testimony of either expert.
6.The defendants argue that the $650,000 in punitive damages was excessive. They base their claim on the fact that of the total $650,000 in punitive damages, $625,000 was assessed against Carney and this is the same figure assessed against Carney for compensatory damages. Despite defendants’ desire that it do so, the Court cannot conclude that the jury simply adopted the figure of $625,000 in punitive damages against Carney because that was the amount of the compensatoiy damages awarded against the institution.
Defendants attack the $650,000 punitive damage award as excessive per se. The Supreme Judicial Court has stated that ”... three main factors should be considered in determining if a punitive damage award is excessive: ‘the degree of reprehensibility of the defendant’s conduct,’ the ratio of the punitive damage award to the ‘actual harm inflicted on the plaintiff,’. . . [and] a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.’ ” [Citation omitted.] Labonte v. Hutchins & Wheeler, supra, at 826-27. A judge is to scrutinize the relation between the actual and the punitive damages award and should assure that “it is reasonable and not simply a criminal penalty.” Id. at 826.
Punitive damages have been upheld even when greatly in excess of the compensatory damage award. See TXO Prods. Corp. v. Alliance Resources Corp., 509 U.S. 443, 460-62 (1993) (punitive damage award of $10 million affirmed when compensatory damages were only $19,000). Indeed, punitive damages have even been upheld in the absence of any award of compensatoiy damages. See Bain v. City of Springfield, 424 Mass. 758, 767-69 (1997) ($100,000 punitive damage award and no compensatoiy damage award).
*579 In considering the propriety of the punitive damage award in light of the factors enumerated in Labonte v. Hutchins & Wheeler, supra, at 827, the Court notes that it is reprehensible for any organization to fire a person because of the perception of homosexuality; there was evidence of significant harm inflicted on the plaintiff because of this act; and the evidence indicated that the hospital enjoyed substantial profits during the years in question. Although the charitable purpose of the institution could be a factor in mitigating the amount of punitive damages, charities have no license to discriminate any more than does a private business. The conduct certainly was “outrageous.” Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 17 (1998).
7. Defendants argue that Carney Hospital is protected by the charitable immunity statute. See G.L.c. 231, §85K, providing that in any “cause of action based on tort brought against a [charitable] corporation, . . . liability . . . shall not exceed the sum of twenty thousand dollars exclusive of interest and costs.” The $20,000 charitable immunity tort damages cap does not apply to c. 151B awards because a violation of c. 151B is not a tort. At least in the employment area, actions under c. 151B should be considered actions “based on contract” rather than actions “based on tort.” See McMillan v. Massachusetts Society for Prevention of Cruelty to Animals, 168 F.R.D. 94, 96, 97 (D.Mass. 1995) (on reconsideration); Forti v. Massachusetts Institute of Technology, No. 92-3948 (Middlesex Sup. Ct. June 5, 1996) (McHugh, J.). See also Kuppens v. Davies, 38 Mass.App.Ct. 498, 500 (1995) (“serviceable” distinction made between tort and c. 151B actions for purposes of future income awards). See also Birbiglia v. St. Vincent Hospital, Inc., 427 Mass. 80 (1998).
8. Defendants claim that the plaintiff did not meet his burden of proof because he did not establish a prima facie case of discrimination. See Wheelock College v. Massachusetts Commission Against Discrimination, 371 Mass. 130, 134-36 (1976), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); White v. University of Mass. at Boston, 410 Mass. 553, 557 (1991). Specifically, defendants maintain that the plaintiff did not prove that he was a homosexual and, therefore, did not establish that he was part of a protected class. They contend that there is no action under c. 151B for discrimination because of perceived homosexuality. The Court ruled on this at trial. The Court’s reasoning is contained in the transcript and need not be repeated here.[8]
Defendants further maintain that plaintiff did not meet his burden of establishing that the articulated reason for plaintiffs termination (that plaintiff spit in the faces of Duro and Walsh thereby retaliating against them for complaining about plaintiffs sexual harassment) was pretextual and that the actual reason for his termination was his perceived sexual orientation. Defendants complain that plaintiffs evidence in this regard was limited to “the Catholic identity of Carney Hospital" and a few “isolated or ambiguous remarks” by some of the individual defendants, see Fontaine v. Ebtec-Corp., 415 Mass. 309, 314, n.7 (1993) (isolated remarks cannot prove employer’s discriminatory intent). The evidence is contrary to the defendants’ assertion. There was substantial evidence of discriminatory remarks against the plaintiff. Several of the individual defendants admitted that they were out to “get” the plaintiff because they thought he was “queer.” The plaintiffs supervisor, Gada, stated that plaintiff would not have been discriminated against if he were married or had a girlfriend and that plaintiff was discriminated against because he was “light in his loafers.” In addition, documentary evidence from Sister Natwin emphasized her continuing concern with plaintiffs sexual orientation and indicated her predisposition to find against the plaintiff on the sexual harassment charges. There was also evidence that Sister Natwin delayed her investigation of the charges to the plaintiffs detriment and that she made no effort to investigate the discrimination by the individual defendants. Finally, evidence was introduced that Sister Natwin had falsified her handwritten notes on the discrimination issue. Similarly, the evidence amply supports the verdicts against Gada, Natwin, Walsh and Duro for aiding and abetting the alleged discrimination.
9.The defendants complain that the plaintiff did not satisfy the statutory prerequisites for filing a c. 151B claim. Defendants state that the charge of discrimination submitted to the Massachusetts Commission against Discrimination (MCAD) alleged a claim of retaliation, not sexual orientation discrimination; and that the charge at the MCAD was filed only against Carney Hospital and not against the individual defendants. As to the argument that plaintiffs MCAD complaint set forth a retaliation claim only, evidence at trial indicated that the plaintiff told an exceedingly long tale to the MCAD. Plaintiff testified that he outlined all his claims including sexual orientation discrimination by all the defendants and that the MCAD “intake person” simply wrote a summary statement which the plaintiff signed.
This Court determines that there was an adequate administrative charge to support the present Superior Court action. The plaintiff has complied with the spirit of the MCAD rules. Evidence at trial indicated that the plaintiff is not an attorney and was not represented by counsel at the MCAD. Plaintiffs statement at trial that an “intake person” summarized his information supports the inference that the charge contains the intake person’s perception of the essence of plaintiffs statement. On that basis, and on its own investigation, the MCAD then made its probable cause determination. (See charge and finding of MCAD.)
The jurisdictional requirement of filing with the MCAD is not intended to create traps for the unwary. The MCAD process is not a game in which specific words written by non-attorneys take on heightened significance when there has been general compliance with the spirit of the rule. Although the complaint can *580 be parsed in a number of ways, for purposes of vesting jurisdiction in the Superior Court it states sufficiently that action was taken against the plaintiff because of the perception that he was a homosexual.[9]
The appellate courts advise that we may look for guidance in the c. 15 IB area to Federal case law construing the Federal anti-discrimination statutes. Wheatley v. American Telephone & Telegraph Co., 418 Mass. 394, 397 (1994). “The complaint in a Title VII action is limited to the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination. [Citations omitted.] All claims of discrimination are cognizable that are ‘like or reasonably related to the allegations of the charge and growing out of such allegations.’ ” Lewis v. The Merchants Bank, 1992 U.S. Dist. Lexis 4631 (W.D. Mo. March 23, 1992), citing Babrocky v. Jewel Food Co. and Retail Meatcutters Union, 773 F.2d 857, 864 (7th Cir. 1985), and Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1475-76 (9th Cir. 1989).
Here, discrimination because of bias against homosexuality is reasonably related to the allegations of the MCAD charge and grows naturally from those allegations. While the MCAD complaint is written in terms of the other employees retaliating against plaintiff for sexual harassment after the plaintiff had complained about the other employees’ remarks, the complaint creates the inference that the hospital protected people who were sexually harassing plaintiff because he was perceived as a homosexual. The complaint thus suggests that there was a level of homophobia at the hospital which, at the worst, resulted in plaintiffs discharge or, at the least, caused the hospital to fail to take seriously plaintiffs complaints about other employees harassing him because of sexual perceptions. The fact that this perception of possible homosexuality had an impact on plaintiffs employment status was sufficiently raised by the MCAD complaint. See Leclerc v. Interstate Distributors, Inc., Graham, J., (Norfolk C.A. 97-02008, 1998). ”[C]ourts do not demand hypertechnical compliance with the filing requirements of title VII and the ADEA in recognition of the fact that lay persons often file EEOC charges without consulting lawyers.” Secrist v. Burns Intern. Sec. Services, 926 F.Sup., 823, 825 (E.D. Wis. 1996).
It is noted that the MCAD is an agency developed to assist, not hinder, plaintiff employees. The purpose of the procedure is to afford the agency an opportunity to resolve the matter. It would be illogical to have a system created for the benefit of those such as plaintiff used to thwart claims for failure to utter “magic words.”[10]
Defendants also claim that plaintiff failed to name the individual defendants in the MCAD complaint. Again looking to federal authority for assistance, the federal statute provides that “[A] civil action may be brought against a respondent named in the charge." 42 U.S.C. s. 20003-5(f)(l). “A party not named in an EEOC charge may not be sued under Title VII . . .” Lewis v. The Merchants Bank, supra, at 6. “This requirement is not jurisdictional but rather is in the nature of a condition precedent to bringing suit. [Citations omitted.]” Id. See also Secrist v. Burns Intern. Sec. Services, supra, at 825. It operates “ ‘like a statute of limitations in that if it is raised in a timely fashion it serves as a shield to prevent the commencement of a cause of action against the unnamed defendant’... If the defendant does not challenge the satisfaction of the preconditions specifically and with particularity, then the plaintiffs allegations are assumed admitted and the defendant cannot later assert that a condition precedent has not been met.” [Citation omitted.] Lewis v. The Merchants Bank, supra, at 6.
In the present case, defendants have waived their claim that the c. 151B count should be dismissed against certain defendants because of the plaintiffs failure to name them in the charge at the MCAD. They did not raise it in their answer or in their numerous pretrial filings. It was not raised at all until the Court raised the issue the day before plaintiff rested his case. Trial Transcript, Vol. 8, at 8-206. See also Mass.R.Civ.P. 12(h)(1) and Colley v. Benson, Young & Downs Insurance Agency, Inc., 42 Mass.App.Ct. 527, 533 (1997) (defense of lack of personal jurisdiction can be waived through nonassertion).
In addition, this case is distinguishable from the Superior Court cases on this issue which are cited by the defendants. Those cases all resolved the issue of personal jurisdiction when it was raised by a motion to dismiss, not when it had never been mentioned until the conclusion of plaintiffs case. See Salhab v. Middlesex County, 2 Mass. L. Rptr. No. 2, 35 (May 16, 1994); Riebold v. Eastern Casualty Insurance Company, Inc., 6 Mass. L. Rptr. No. 32, 706 (July 7, 1997).
10. Defendants contend that the plaintiffs action was untimely. This issue has been resolved by the ruling of this Court (Brady, J.) made in response to defendants’ motion for judgment on the pleadings.
11. Defendants’ argument that the evidence does not support plaintiffs claim of interference with advantageous relations against defendants Walsh and Duro is rejected. See discussion, supra, of evidence supporting plaintiffs c. 15IB claim. In addition, contraiy to defendants’ argument, there was ample evidence that the individual defendants Duro and Walsh were motivated by a “spiteful, malignant purpose.” See King v. Driscoll, 418 Mass. 576, 587 (1994). There was substantial evidence that these men harassed plaintiff unmercifully and sought to harm him and have him fired: they tried to beat him up; they tried to start a fight with him at Winston Jarvis’ party; they harassed him at work and encouraged others to do so; and they sought to have him fired by initiating a petition, a sickout and false sexual harassment charges. In addition, they made virtual admissions of wrongdoing to witnesses who so testified at trial (plaintiff, Celio Colon, Earl Harley and Kalvin Ryland). The verdict *581 against the defendants Walsh and Duro on this count was well supported by the evidence.
As to the issues concerning interest, prejudgment interest is not assessed on front pay awards. Conway v. Electro Switch Corp., 402 Mass. 385, 390-91 (1988). Since it is impossible to determine how much of the jury award was for front pay, no prejudgment interest can be calculated. The plaintiffs have waived the right to claim this by not seeking an itemization of damages.
Interest from the date of verdict to the date of judgment is calculated at the prejudgment interest rate. G.L.c. 235, §8. Postjudgment interest runs from the date judgment is entered. See Shawmut Community Bank, N.A., v. Zagrami, 419 Mass. 220 (1994); Trinity Church v. John Hancock Mut. Life Ins, Co., 405 Mass. 682, 683 (1989).
ORDER
For all the foregoing reasons, the defendants’ motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur, is DENIED.

 The plaintiffs amended complaint originally asserted five separate causes of action: the two above-named claims and claims for civil conspiracy, wrongful discharge in violation of public policy and defamation.

 See, for example, the following colloquy.
The Court: Good afternoon, Mr. Mitchell. What is the problem, please.
Mr. Mitchell: Hi. I don’t have a problem. I am just a practicing Catholic and I was raised to believe that the clergy probably, probably would not lie. I don’t believe they would lie outside of a court. I don’t think they would lie in this court especially, you know. [Emphasis supplied.]
The Court: So you would believe the testimony of a nun simply because she is a nun?
Mr. Mitchell: I would.
The Court: Fine. I will excuse you. Thank you for telling us.
(Trial Transcript, Vol. 1, at 1-116.)

 Defendants complain also that the Court did not pose follow-up questions to these two jurors as to whether, despite their religion, they could reach a fair decision based on the evidence. Such a question would be superfluous in view of the jurors’ stated beliefs.

 During a colloquy following the voir dire of the first juror who indicated that he would tend to believe a mm because of her position in the church, defendants stated that "we put it [objection to the voir dire question] in writing and submitted to the court.” However, the defendants have never produced this “writing” during the numerous post-trial proceedings on this case or even referred to it in any of their many post-trial written submissions. Trial Transcript, Vol. I, at 1-99-101.

 The necessity for this voir dire question is apparent from the responses of the two jurors who were excused by the Court. See, for example, fn. 4.

 Defendants argue that they did not acquiesce to the single value for compensatory damages because they requested that the front pay issue be decided by the jury rather than the judge. However, once the Court decided that the front pay question would be sent to the jury, the defendants never requested that any amounts be separately identified by the jury and the Court specifically indicated that the jury would be returning a single value for damages. The inescapable inference is that the defendants took a strategic gamble and lost.

 Plaintiffs former roommate (who had moved to Georgia about nine months before plaintiffs termination) also testified that when he spoke to plaintiff by telephone plaintiff “seemed almost suicidal and he talked about, you know, it wasn’t worth it. And I knew he was going through a lot . . .” The roommate had no specialized training to make such observation, but there was no objection to this testimony. Trial Transcript, Vol. 4, at 4-65.
Plaintiff testified (also without objection) that he was told he was “having severe emotional problems . . . and better go get some help.” Trial Transcript, Vol. 3, at 3-157.

 Within a particular subject matter area that is encompassed by c. 151B, i.e., sexual harassment, a majority of the Supreme Judicial Court has held that the fact that an employee and employer are the same sex does not deny the plaintiff a cause of action. See Melnychenko v. 84 Lumber Co., 424 Mass. 285 (1997). To the extent that that informs the application of other sections of c. 151B, which in the present case is that the plaintiff not be deprived of his rights as an employee because of some form of sexual orientation discrimination, Melnychenko suggests that the Court would take the same view here.

 The form used by the MCAD in this case did not contain “boxes” asking for the “cause of discrimination.” Cf. the form used by the MCAD at issue in Riebold v. Eastern Casualty Insurance Company, Inc., Brassard, J., Midd. No. 9700306, 6 Mass. L. Rptr. No. 32, 706 (July 7, 1997).

 The defendants cite Belloni v. Reservoir Nursing Center, 1 Mass. L. Rptr. No. 22, 448 (Feb. 21, 1994) (McHugh, J.) (summary judgment allowed as to handicap discrimination claim because plaintiff did not check the handicap “box” on the MCAD charge). This case does not control the instant situation. No “boxes” were on the form in the instant case and plaintiff in Belloni was represented by an attorney at the MCAD.