In re Carlos Quinones OCASIO.

Freddy Varela, Appellant,

v.

Carlos Quinones Ocasio, Appellee.

BAP No. 01–002.
Bankruptcy No. 98–03122(GAC).

United States Bankruptcy Appellate Panel of the First Circuit.

Feb. 21, 2002.

Anibal Medina Rios, Bayamon, P.R., on brief, for Appellant.

Juan M. Suarez Cobo, San Juan, P.R., on brief, for Appellee.

FEENEY, VAUGHN and KORNREICH, U.S. Bankruptcy Appellate Panel Judges.

**PER CURIAM.**

## INTRODUCTION

Freddy Varela ("Varela") appeals the decision of the bankruptcy court awarding the Debtor, Carlos Quinones Ocasio (the "Debtor"), actual and punitive damages totaling $10,000, plus attorney's fees and costs, for willfully violating the automatic stay. The principal issues presented are whether the bankruptcy court's finding that Varela willfully violated the automatic stay when he threatened to collect a debt through violence was clearly erroneous and whether the bankruptcy court was justified in awarding the Debtor $10,000 in actual and punitive damages.

## PROCEDURAL BACKGROUND AND JURISDICTIONAL ISSUES

### A.  *Procedural Background*

The Debtor filed a voluntary Chapter 13 petition on March 10, 1998. On June 3, 1999, the Debtor filed a Motion Requesting Order to Show Cause for Willful Violation of Automatic Stay, together with an affidavit ("Declaration Bajo Pena de Perjurio"), in which he claimed $70,000 in actual damages and $35,000 in punitive damages. The bankruptcy court issued an Order to

Show Cause on June 30, 1999 requiring a response from Varela within 30 days. After seeking and obtaining a brief extension of time, Varela filed a response, and the bankruptcy court scheduled a pretrial conference. Following the submission of pretrial reports by the parties, the bankruptcy court conducted an evidentiary hearing on August 31, 2000 at which four witnesses testified and several exhibits were introduced into evidence. At the conclusion of the hearing, the bankruptcy judge dictated his findings of fact and conclusions of law. He determined that Varela willfully violated the automatic stay, awarded the Debtor $10,000 in actual and punitive damages, and directed the Debtor's attorney to file a fee application within 20 days.

On September 19, 1999, the Debtor filed a "Motion for Attorney's Fees as Cost" [sic], together with the affidavit of the Debtor's attorney and a fee application/invoice. Pursuant to the Motion, the Debtor's attorney sought legal fees and costs in the total sum of $4,110.50. On October 10, 2000, Varela filed an opposition to the Motion, stating that attorney's fees, if any, should not exceed $1,500 and requesting an evidentiary hearing. Additionally, Varela filed a Notice of Appeal, although the bankruptcy court's decision of August 31, 2000 had yet to be entered on the docket.[1]

On October 25, 2000, the "minutes of proceedings" and the order of the bankruptcy judge were entered on the docket. Two days later, on October 27, 2000, Varela filed an Amended Notice of Appeal[2] and a Statement of the Issues to be Presented on Appeal and Designation of Record.

One week later, he filed an Amended Designation. On November 6, 2000, Varela timely filed a Request for Additional Findings of Fact pursuant to Fed. R. Bankr.P. 7052 and Fed.R.Civ.P. 52(b). On January 9, 2001, the bankruptcy judge issued a decision and order denying the Request, which order was entered on the docket on January 11, 2001. On January 22, 2001, Varela filed a "Second Amended Notice of Appeal" and a Second Amended Statement of the Issues to be Presented on Appeal and Designation of Record.

Although the Debtor had filed his Motion for Attorney's Fees within 20 days of the August 31, 2000 hearing, the bankruptcy court did not rule on the motion until March 28, 2001. Its order was entered on the docket on April 27, 2001. Neither the Debtor nor Varela filed a separate notice of appeal from that order.[3]

### B. Jurisdiction

As an appellate court, we are "duty-bound to determine ... jurisdiction over this appeal before proceeding to the merits." *Caterpillar Fin. Servs. Corp. v. Braunstein (In re Henriquez)*, 261 B.R. 67, 69 (1st Cir. BAP 2001) (citing, inter alia, *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998), and *Berner v. Delahanty*, 129 F.3d 20, 23 (1st Cir.1997)). Pursuant to 28 U.S.C. §§ 158(a) and (c), bankruptcy appellate panels may hear appeals from "final judgments, orders, and decrees," 28 U.S.C. § 158(a)(1), or "with leave of the court, from interlocutory orders and decrees." 28 U.S.C. § 158(a)(3). An order

---

1. The Notice of Appeal referenced a "hearing held on June 30, 2000."

2. This Notice of Appeal referenced the correct hearing date of August 31, 2000 and the order of October 25, 2000.

3. On August 6, 2001, Bankruptcy Appellate Panel Judge Vaughn, issued an order denying the Debtor's Motion to Dismiss Appeal, finding that Varela's Notice of Appeal was timely filed.

is "final" for purposes of federal appellate jurisdiction when a decision has been entered that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *H & C Dev. Group, Inc. v. First Vermont Bank and Trust Co. (In re Miner)*, 222 B.R. 199, 202 (2nd BAP Cir.1998) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), and *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

■ The order of October 25, 2000 was not a final order because the bankruptcy court deferred decision on the amount of legal fees, ordering the filing of a fee application.[4] Thus, the October 25, 2000 order was interlocutory, and Varela failed to file a motion for leave to appeal with his notices of appeal. *See* 28 U.S.C. § 158(a)(1) and (3) and Fed. R. Bankr.P. 8003. *See also In re Miner*, 222 B.R. at 202; *In re Bank of New England Corp.*, 218 B.R. at 646. Five months after the order of October 25, 2000 was entered, however, the bankruptcy court awarded the Debtor his attorney's fees and costs, thus "finalizing" the order.

■ In *Bank of New England Corp.*, the panel discussed exceptions to the final judgment rule that operate to bestow appellate jurisdiction. 218 B.R. at 652. It noted that 28 U.S.C. § 158(a)(3) provides discretionary authority to hear appeals of interlocutory orders, without delineating any express criteria. *Id.* Although the panel articulated three criteria to ascertain whether it should exercise its discretion to hear an interlocutory appeal in that case, those criteria are inapplicable here.[5] Rather, in this case, the overall policy against piecemeal appeals is applicable and that policy is advanced rather than thwarted by deeming the October 25, 2000 order to be a final order as a result of the bankruptcy court's March 28, 2001 order awarding the Debtor attorney's fees and costs. Accordingly, because the order of October 25, 2000 is now final, this panel shall proceed with the merits of the appeal.

The panel also must address Varela's "Second Notice of Appeal," in which he complained that the bankruptcy court improperly denied his request for additional findings. Federal Rule of Bankruptcy Procedure 8002(b) provides that if a party makes a timely motion to amend or make additional findings of fact under Rule 7052, "the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding." Although as noted above, the October 25, 2000 order was not a final order when it was entered, appellant's request for additional findings was timely filed on November 6, 2000, *see* Fed. R. Bankr.P. 9006(a), and Varela otherwise complied with the provisions of Fed. R. Bankr.P. 8002(b) by filing his "Second Notice of Appeal" within 10 days of the bankruptcy court's decision denying his request.[6] The policy against piecemeal litigation is again applicable and

---

**4.** Neither party considered the interlocutory nature of the appeal. Moreover, the Debtor filed a Supplemental Appendix to his brief to include the minutes of proceedings from the March 28, 2001 hearing.

**5.** In *Bank of New England,* the panel stated: "To ascertain whether we should exercise our discretion to hear ... [the] ... appeal, we will consider whether (1) the 'order involves a controlling question of law' (2) 'as to which there is substantial ground for difference of

opinion,' and (3) whether 'an immediate appeal from the order may materially advance the ultimate termination of the litigation.'" 218 B.R. at 652.

**6.** The decision and order was dated January 9, 2001. The order was entered on the docket on January 11, 2001, and the appellant filed his Second Amended Notice of Appeal on January 22, 2001.

advanced by determining the merits of the appellant's "Second Notice of Appeal," which includes a request for review of the January 11, 2001 order, denying his request for additional findings.

## FACTUAL BACKGROUND

The Debtor, a "civil engineer technician," filed Chapter 13 bankruptcy petition on March 10, 1998. At the time the Debtor filed his Chapter 13 petition, he owed Varela, the owner of several businesses in Corozal, Puerto Rico, approximately $425. The debt arose as a result of the Debtor's purchase of construction materials for his home on credit from Agro Campo, an unincorporated agricultural and hardware business owned by Varela.

Prior to the commencement of the Debtor's Chapter 13 case, Varela had filed suit against the Debtor in the Corozal municipal court to collect the $425 debt. The suit was stayed as a result of the filing of the Debtor's bankruptcy petition. Varela admitted that he was aware that the Debtor had filed a bankruptcy petition. Indeed, he testified at the August 31, 2000 hearing that he had "many accounts that are lost [so] that one more doesn't amount to much," and that he had other "accounts that are before the Bankruptcy Court that are for two thousand ($2,000) and three thousand ($3,000) dollars."

At the August 31, 2000 hearing, the Debtor and Varela both testified that they coincidently "ran into" each other in front of Juanito Vazquez's house on Saturday, May 22, 1999 between 4:00 p.m. and 6:00 p.m. The Debtor indicated that he and Juanito Vazquez and Vazquez's children are close friends, "almost family." Varela stated that Juanito Vazquez is his employee and that he stopped by his house to pay him his wages. The Debtor was about to park his car at Vazquez's house when Varela drove by. Both parties parked

their cars, and Varela approached the Debtor, who was still seated in his car. The Debtor testified that

> [H]e comes toward me until he gets to my car . . . and tells me "What are you going to do about the money you owe me?" That surprised me because Mr. Varela had filed a motion against me and the motion [sic] of the Court was that all collection orders be paralized [sic] and he was notified of it. . . . Well, when I told him I was . . . look, the trustee sent you a letter because I am under the protection of the bankruptcy law. What he answered me was that the trustee didn't have to send him any letter. Then is when he got upset. . . . I was stunned. I didn't know what to answer. I tried to indicate the procedure to him and . . . he continued insulting me. . . .

> \*　　\*　　\*　　\*　　\*　　\*

> [H]e insisted that all those who resort to bankruptcy are "cuckholds." I swallowed hard because I felt . . . that Mr. Varela was going to attack me, which he didn't do. . . . I tried to explain the bankruptcy procedure again to him.

> \*　　\*　　\*　　\*　　\*　　\*

> The bankruptcy procedure, that it goes to the trustee . . . because I filed for Chapter 13 with the intent of paying. That sooner or later he was going to collect his money. . . . [H]e continued insulting me and said these words to me, "In fact, I'm going to give you one day for you to come up with the money; otherwise I know where I can get it from. I'm going to get it from your face.["] And then Juanito Vazquez came up from the house and said "Freddy what happened?" Well, the argument ended right there.

The Debtor also testified that eight or nine people were in the vicinity and that

he was embarrassed. He stated: "[T]o call someone a 'cuckhold', it seems to me is unethical in the sense that it means my wife is being unfaithful to me." More importantly, he stated that he feared for his safety "because Mr. Varela's conduct was very specific in that he was going to take the money from my face." The Debtor also stated that after Varela left his friends made fun of him. "[T]hey started saying, look he is going to hit you ... And that, listen, he called you a 'cuckhold,' and all that." The Debtor said this happens every time he passes Vazquez's house. "Sometimes they comment like 'Look, I am going to sick Freddy Varela on you.'"

The Debtor said he was afraid of Varela, feared for his safety because of the threat to collect the debt from his face, and felt Varela was an aggressive person, particularly as he was aware Varela carried a gun. Mr. Santiago, a police officer in Corozal for 13 years, testified that he knows Varela and that he has a good reputation in the community. He also testified, however, that Varela was licensed to carry a weapon.

In contrast to the Debtor's testimony, Varela stated the following:

> I got out in front of his car and went up to him. And I asked him what the status was of the case he had in the bankruptcy court. He told me right there that he didn't care about that, to call the bankruptcy court and they could tell him [sic] what the situation was. And I told him that I did care about it because my money was involved there. And he said, "I'm already under the protection of the bankruptcy law and that's not my problem."

Varela admitted that he then called the Debtor lazy and irresponsible.

The Debtor's wife testified that the Debtor was "hysterical" and had a headache upon returning home from the incident with Varela. Four or five days later, he still did not feel well and went to a doctor who recommended medication for his nerves. She was unable to remember either the name of the doctor or the name of the pills that were prescribed.

Following the incident on Saturday, May 22, 1999, the Debtor consulted his lawyer. On Monday, May 24, 1999, he signed a sworn statement at his lawyer's office and filed two criminal complaints: one for making a threat and the other for disturbing the peace.[7] Varela was not prosecuted for the threat complaint, and the Debtor sought dismissal of the disturbance complaint as a result of a discussion with a police officer.

At the conclusion of the trial on August 31, 2000, the bankruptcy court determined that Varela willfully violated the automatic stay. The bankruptcy court stated that Varela "admitted facts that we believe give complete credit to the testimony of the Debtor" adding:

> Mr. Varela ... has admitted facts of calling the Debtor lazy and irresponsible. We have no doubt that this said [sic] in front of various witnesses, even though they are not present today, even if they were said only in the presence of the Debtor himself, would be enough to constitute a violation of the stay.
>
> We also believe that what Mr. Carlos Quinones testified, being called a bad name, and also of the shame and humiliation and threatening to collect from him in his face, are serious violations of the stay which this Court cannot and will not tolerate.

Accordingly, the bankruptcy court awarded damages in the amount of $10,0000 to

---

7. Police reports appear in the record, although they are in Spanish.

the Debtor. Although the bankruptcy court initially stated that there was no evidence of actual damages, it awarded the Debtor actual damages of $1,000, punitive damages of $9,000 and instructed to the Debtor's attorney to submit a fee application.

## STANDARDS OF REVIEW

In *In re Rijos*, 263 B.R. 382, 387 (1st Cir. BAP 2001), the Bankruptcy Appellate Panel for the First Circuit, quoting *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 266 (1st Cir.1999), stated "[w]e review directly the bankruptcy court's findings of fact and rulings of law." It also observed that appellate courts independently review the bankruptcy court's decision, applying the "clearly erroneous" standard to findings of fact and de novo review to conclusions of law. *Id. See also Stoehr v. Mohamed*, 244 F.3d 206, 208 (1st Cir.2001) (citing *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir.1994), and *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1310–11 (1st Cir.1993)).

■ Specifically, with respect to violations of the automatic stay,

> An appellate court reviews *de novo* a bankruptcy court's interpretation and application of section 362(h). Moreover, a bankruptcy court's determination that the automatic stay provisions of section 362 have been violated involves a question of law that is subject to *de novo* review. A court's assessment of damages is reviewed for an abuse of discretion.

*In re Miller*, 262 B.R. 499, 502–03 (9th Cir. BAP 2001) (citations omitted). Similarly, in *In re Sharon*, 234 B.R. 676 (6th Cir. BAP 1999), the court stated:

> The Panel reviews questions of law and of statutory interpretation de novo. The bankruptcy court's factual findings are reviewed under the clearly erroneous standard. See Fed. R. Bankr.P. 8013. "The sanction or remedy imposed by the bankruptcy court for violation of the automatic stay is reviewed for abuse of discretion." "A bankruptcy court's decision with respect to the amount of damages constitutes a factual finding, and, ..., we may not upset such findings unless they are 'clearly erroneous.' "

234 B.R. at 679–80 (citations omitted). *See also In re Diviney*, 225 B.R. 762, 769 (10th Cir. BAP 1999)("[w]hether a party's actions have violated the automatic stay is a question of law which is reviewed *de novo*.... An award of sanctions for a violation of the automatic stay is reviewed for abuse of discretion.").

While decisions appear uniform as to de novo review of determinations that the automatic stay has been violated, the United States Supreme Court has clarified that appellate courts should apply a *de novo* standard of review when reviewing whether a punitive damages award is excessive and violates due process. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001). The Court rejected the less demanding abuse-of-discretion standard for the reason that an independent review is necessary of punitive damages determinations, which are made on a case by case basis, to clarify legal principles, unify precedent, and stabilize the law. *Id.* In light of the Supreme Court's decision, the United States Court of Appeals for the First Circuit cast doubt on whether the abuse of discretion standard applies to all damage awards, particularly the standard for reviewing punitive damage awards. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir.2001). In *Zimmerman*, the court observed the following:

> Historically, the standard of review applied to punitive damage awards has not been a model of clarity. In diversity cases, we sometimes have utilized the

same standard of review that obtains in state court. *E.g., Ansin v. River Oaks Furniture, Inc.,* 105 F.3d 745, 759 (1st Cir.1997). On other occasions, we have applied a bifurcated standard, reviewing de novo the legal question of whether the evidence suffices to justify an award, and if it does, reviewing the trial court's determinations as to excessiveness, inadequacy, and other amount-related questions for abuse of discretion. *E.g., McMillan v. Mass. SPCA,* 140 F.3d 288, 306 (1st Cir.1998). The Supreme Court, however, recently has clarified that, under the Due Process Clause of the Fourteenth Amendment, the amount of a punitive damage award presents a legal issue. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001). Thus, both the extent of a state-law punitive damage award and the sufficiency of the evidence on which it is premised engender de novo review in a federal appellate court. *See id.* Since *Cooper* supplants our prior precedents, we take a fresh look at the amount of the punitive damage award in this case.

Where punitive damages are involved, de novo review is informed by principles of fundamental fairness. Those principles "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

BMW furnishes three general guideposts for conducting such a review: (1) What is the degree of reprehensibility of the defendant's conduct? (2) What is the ratio between the compensatory and punitive damages? (3) What is the difference between the punitive damage award and the civil penalties imposed for comparable conduct? *Id.* at 575, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. These guideposts should neither be treated as an analytical straitjacket nor deployed in the expectation that they will "draw a bright line marking the limits of a constitutionally acceptable punitive damages award." *Id.* at 585, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. Other pertinent factors may from time to time enter into the equation. When all is said and done, a punitive damage award will stand unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct. *Romano v. U–Haul Int'l,* 233 F.3d 655, 672 (1st Cir.2000).

262 F.3d at 81. *See also Labonte v. Hutchins & Wheeler,* 424 Mass. 813, 678 N.E.2d 853 (1997).[8] Accordingly, we will apply a *de novo* standard of review of the bankruptcy court's punitive damage award.

## DISCUSSION

### 1. *The Violation of the Automatic Stay*

■ The bankruptcy court's factual findings are supported by the record and

---

**8.** In *Labonte,* the court stated that a reviewing court should consider the following:

> a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred; a reasonable relationship to the degree of reprehensibility of the defendant's conduct; removal of the profit of an illegal activity and be in excess of it so that the defendant recognizes a loss; factoring in of

the costs of litigation and encourage plaintiffs to bring wrongdoers to trial; an examination whether criminal sanctions have been imposed; an examination whether other civil actions have been filed against the same defendant.

*Id.* at 862–63 (citing *BMW,* 517 U.S. at 589–92, 116 S.Ct. 1589, 134 L.Ed.2d 809 (Breyer, J., concurring)).

do not engender a "definite and firm conviction that a mistake has been made." *See United States v. Maldonado*, 215 F.3d 1046, 1050 (9th Cir.2000). The bankruptcy court cogently summarized the evidence and credited the Debtor's testimony over that of Varela. In view of the test articulated by the First Circuit in *Kaneb* for the determination of a § 362(h) violation, namely knowledge of the automatic stay and an intent to do those acts that constitute a violation of the stay,[9] the bankruptcy court did not err in concluding that Varela willfully violated the automatic stay. The bankruptcy court's conclusion was compelled in view of Varela's admissions and the Debtor's credible testimony about what transpired on May 22, 1999.

Varela raises a variety of arguments pertaining to the sufficiency of the evidence. For example, he complains that the evidence was insufficient for the bankruptcy court to find that he violated the automatic stay as his words were constitutionally protected, that the Debtor's testimony about the incident on May 22, 1999 was uncorroborated by the testimony of the friends who were present at Juanito Vazquez's house, that the bankruptcy court failed to credit the testimony of Rene Santiago that he has a good reputation in the community, and that there was insufficient evidence that the Debtor sought and received medical treatment as a conse-

quence of the incident. Despite the plethora of issues raised by Varela with respect to the sufficiency of the evidence, and his unsupported suggestion that a debtor must prove a § 362(h) violation with clear and convincing evidence, the bankruptcy court was persuaded by the Debtor's testimony as well as by the testimony of his spouse. The bankruptcy court was convinced that Varela threatened the Debtor and did not limit his invective to calling the Debtor lazy and irresponsible. That testimony was sufficient and did not need to be corroborated by additional testimony.

### 2. The Actual Damage Award

■ Varela also challenges the bankruptcy court's award of actual damages, citing that portion of the transcript where the court stated: "The evidence of actual damages has been none at all. But in this case, the Court is going to estimate that the damages in this case should be no less than ... [one] thousand dollars ($1,000) and attorney's fees...." While this statement might suggest an error in the award of actual damages, the record amply supports the award of actual damages because of the Debtor's testimony that he was embarrassed and felt threatened, as well as his wife's testimony that the Debtor was disturbed and had to seek medical treatment.

---

**9.** In *Kaneb*, the court stated:

A willful violation does not require a specific intent to violate the automatic stay. The standard for a willful violation of the automatic stay under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation. *See Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.1989); *see also Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir. 1990); *Cuffee v. Atlantic Bus. and Community Dev. Corp. (In re Atlantic Business and Community Corp.)*, 901 F.2d 325, 329 (3d Cir.1990). In cases where the creditor received actual notice of the automatic stay, courts must presume that the violation was deliberate. *See Homer Nat'l Bank v. Namie*, 96 B.R. 652, 654 (W.D.La.1989). The debtor has the burden of providing the creditor with actual notice. Once the creditor receives actual notice, the burden shifts to the creditor to prevent violations of the automatic stay. *See Mitchell Const. Co., Inc. v. Smith (In re Smith)*, 180 B.R. 311, 319 (Bankr.N.D.Ga.1995).

196 F.3d at 269.

In *Kaneb*, the First Circuit addressed the issue of actual damages, stating the following:

> In responding to ... [a] ... general challenge to the sufficiency of the damages evidence, we note that emotional damages qualify as "actual damages" under § 362(h). *See Holden v. IRS (In re Holden)*, 226 B.R. 809, 812 (Bankr. D.Vt.1998) ("Emotional distress is an actual injury.... Legitimate human emotions are brought to bear when one's rights are trampled on."); *In re Carrigan*, 109 B.R. 167, 170 (Bankr.N.C. 1989)("The debtor's actual injury here is somewhat imprecise, but it is real—and, it is certainly the result of [the creditor's actions]."); *but see In re McPeck*, 1991 WL 8405 at *3 (Bankr.D.Minn. Jan. 29, 1991).

196 F.3d at 269. In view of the unrebutted testimony and the observations of the First Circuit in *Kaneb*, the record, if not the bankruptcy court's exact words, supports the decision to award $1,000 in actual damages plus attorney's fees of $3,288. Although Varela focused on the lack of corroboration with respect to medical treatment, the bankruptcy court was justified in believing the testimony of the Debtor's spouse that her husband was forced to seek medical advice because of his emotional distress. In view of the modest award of actual damages and attorney's fees and costs, the decision of the bankruptcy court was justified.

### 3. The Award of Punitive Damages

Varela objects to the award of punitive damages arguing that there was insufficient evidence to justify the award. The bankruptcy court, however, weighed the evidence and determined that Varela actions constituted "a very serious matter," justifying the award.

In determining whether a punitive damage award is appropriate, the First Circuit directs reviewing courts to apply the "guideposts" posited by the Supreme Court in *BMW of N. Amer., Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Accordingly, we must evaluate the reprehensibility of Varela's conduct; the ratio between the compensatory and punitive damages, and difference between the punitive damage award and the civil penalties imposed for comparable conduct.

With respect to the first factor, the First Circuit has stated that "[t]he automatic stay is among the most basic of debtor protections under bankruptcy law," and that "[i]n order to secure ... [its] ... important protections, courts must display a certain rigor in reacting to violations...." *In re Soares*, 107 F.3d 969, 975 (1st Cir.1997). For individual debtors, § 362(h) provides the vehicle for reacting to violations, as "[t]he primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior; ... [and] ... the prospect of such change is relevant to the amount of punitive damages to be awarded." *In re Shade*, 261 B.R. 213, 216 (Bankr.C.D.Ill.2001)(citing *In re Riddick*, 231 B.R. 265, 269 (Bankr. N.D.Ohio 1999), and *In re Novak*, 223 B.R. 363 (Bankr.M.D.Fla.1997) (bankruptcy court gauges punitive award based on gravity of creditor's offense, and sets award at level sufficient to ensure that it will punish and deter)). The court in *Shade* listed a number of factors to be considered in awarding punitive damages, factors that are not inconsistent with those set forth in *BMW*, including: "the nature of the creditor's conduct, the nature and extent of harm to the debtor, the creditor's ability to pay damages, the level of sophistication of the creditor, the creditor's

motives, and any provocation by the debtor." *Id.* (citations omitted).

■ In the instant case, Varela not only violated the automatic stay, he did so in a manner that was vulgar, demeaning, and threatening. When one considers the spectrum of stay violations from mailing bills or account statements to harassing telephone calls, automobile repossessions and home foreclosures, an instance where bodily harm is threatened is, as the bankruptcy court recognized, serious indeed. The Debtor and his attorney also recognized the significance of Varela's conduct and responded by filing criminal complaints against him. Thus, the reprehensibility of Varela's conduct, more than any other factor, mandates an award of punitive damages.

The ratio of the compensatory and punitive damages would not appear to change the result, although it might suggest a reduction in the amount of the award. Unlike commercial litigation where the ratio of compensatory to punitive damages may be 4:1, or 2:1 as in *Zimmerman,* in the bankruptcy context compensatory damages may not be high in relation to punitive damages. In this case, the ratio is approximately 1:9.

With respect to the final guidepost, the First Circuit provides the following assistance:

The final *BMW* guidepost directs a reviewing court to assess the punitive damage award in light of the complex of statutory schemes developed to respond to the same sort of underlying conduct. On this factor, "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589, 134 L.Ed.2d 809 (citations and internal punctuation omitted).

262 F.3d at 83.[10]

Obviously, this latter guidepost poses something of a problem as there is not a complex of statutory scheme designed to respond to violations of the automatic stay other than the Bankruptcy Code itself. Significantly, § 362(h) specifically provides for the award of punitive damages.[11] Thus, creditors must be presumed to be on notice that if they violate the automatic stay they will be liable for punitive damages. In this case, Varela was aware of the automatic stay. Moreover, he testified that other customers of his various businesses who owed him money had filed petitions in the bankruptcy court. As the owner of a number of businesses which extended credit, Varela exhibited a level of sophistication that weights against a reduction of the punitive damage award.

**10.** The court added the following:

Decided cases are relevant, but positive law—statutes and regulations—are even more critical. Moreover, a reviewing court should search for comparisons solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall. In *BMW,* for example, the Court compared the multimillion dollar verdict with civil fines for the same behavior that ranged from $50 to $10,000. 517 U.S. at

584, 116 S.Ct. 1589, 134 L.Ed.2d 809. Since none of these statutes provided the defendant "with fair notice that the first violation ... of [the Alabama statute's] provisions might subject an offender to a multimillion dollar penalty," the punitive damage award did not pass muster. *Id.*

**11.** Additionally, actions for contempt or sanctions under Fed. R. Bankr.P. 9011 or 11 U.S.C. § 105 may be informative to the extent violations of court orders or injunctions are addressed.

Notably, in *Shade*, the court awarded the debtor $9,000 in punitive damages for a the conduct of a creditor's representative in accosting the debtor to demand payment after the § 341 meeting. The creditor in that case was a large and sophisticated finance company.

Varela, though a successful businessman with some experience with bankrupt debtors, is not in the same position as a national financing company with in-house counsel. Nevertheless, he not only accosted the Debtor while aware of the existence of the automatic stay, he threatened the Debtor with bodily harm. Although the evidence did not suggest that Varela routinely threatened force to collect debts as part of his business strategy, his conduct was chilling. Accordingly to satisfy the primary purpose of a punitive damage award, namely to change a creditors behavior, a $9,000 award is justified.

Bankruptcy court decisions are far from uniform with respect to when and under what circumstances punitive damages are awarded. A survey of bankruptcy cases in which punitive damages have been both awarded and denied is included in Eric C. Surette, *Remedies and Damages for Violations of the Automatic Stay Provisions of the Bankruptcy Code (11 U.S.C. § 362(h)) by Parties Other than the Federal Government*, 153 A.L.R. Fed. 463, § 7 (1999). Considering the factors articulated by both the United States Supreme Court and the First Circuit, as well as punitive damage awards made by other courts, we find that under the circumstances of this case, the $9,000 award was justified.

4. *Denial of the Request for Additional Findings of Fact*

■ In his Request for Additional Findings of Fact, Varela requested 11 additional findings, including findings related to the court's determination that he was an aggressive person and the facts used to establish the award of punitive damages. Specifically, Varela asked the court to determine the following:

> To determine as a fact that Mr. Rene Santiago's testimony was that he knew Mr. Freddy Varela and that he has [sic] good reputation in his hometown of Corozal and that he knew nothing derogatory of Mr. Freddy Varela.

> To determine as a fact the name of the doctor and medicines that Mr. Quinones allegedly sought as a consequence of the incident.

> To determine as a fact that prior to May 22, 1999 Mr. Freddy Varela had no communications with Mr. Quinones and that after May 22, 1999, Mr. Freddy Varela did not communicate with Mr. Quinones.

> To determine as a fact the acts against the estate allegedly committed by Freddy Varela.

> To determine what facts constitute a clearly manifested attempt of Freddy Varela to recover on a pre-petition debt.

> The fact that the incident occurred after a year that debtor filed petition for relief [sic].

> The fact that there were independent witnesses of the incident occurred in May 22, 1999 and that Mr. Caponize [sic] did not bring to the hearing any of said witnesses [sic].

> That debtor filed a complaint with the Police Department for the alleged facts after he went to his bankruptcy attorney.

> That the testimony of Mr. Quinones was stereotyped [sic].

Citing *Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Comm., Inc.*, 899 F.2d 119, 123 (1st Cir.1990), for the proposition that the purpose of Rule 52(b) "is to permit the correction of any manifest errors of law or fact that are discover upon recon-

siration by the trial court," the bankruptcy court denied Varela's Request. It reviewed the proposed facts and concluded that "none of them are intrinsic to the order issued by the Court" and that some were irrelevant.

The ruling of the bankruptcy judge was not an abuse of discretion. Some of Varela's proposed findings of fact simply were not part of the record (i.e., the name of the doctor and medicines prescribed for the Debtor's nerves), and others are more properly the subject of this appeal (i.e., the criteria used by the bankruptcy court in awarding actual and punitive damages). Given the abuse of discretion standard,[12] and the bankruptcy judge's reasoning, there was no abuse of discretion. Nevertheless, in reviewing the transcript from the hearing on August 31, 2000, Rene Santiago did testify as to Varela's good reputation, there was no testimony that Varela communicated with the Debtor at any time other than on May 22, 1999, which was approximately 14 months after the Debtor filed his bankruptcy petition, and the Debtor filed criminal complaints against Varela after he consulted his attorney. The bankruptcy court correctly determined, however, that these facts were not intrinsic to its conclusion that Varela violated the automatic stay.

### CONCLUSION

Based upon the foregoing, the decision of the bankruptcy court is AFFIRMED.

---

**12.** In *In re Warner*, 247 B.R. 24, 25 (1st Cir. BAP 2000), the panel stated the following:
Judicial discretion is necessarily broad—but it is not absolute. Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them. 247 B.R. at 25 (quoting *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988)).