MacLeod, Bonnie H., J.
On December 10, 2012, a juiy returned a verdict in favor of the Plaintiff Jeannie M. Kelley (“Plaintiff’ or “Ms. Kelley”) against the Defendants Commonwealth of Massachusetts, Department of Conservation and Recreation (“Defendants” or collectively “Commonwealth”) on the Plaintiffs claim of retaliation. The jury awarded the Plaintiff $139,000 in back pay, $500,000 in emotional distress damages, and $250,000 in punitive damages. The Defendants have filed motions for Judgment Notwithstanding the Verdict and for Remittitur of Damages or, in the alternative, a New Trial.[1] The parties filed lengthy memoranda on all post-trial motions and a hearing was held before this Court in March 2013.[2] After consideration of all submissions, for the following reasons, the Defendants’ motions are DENIED.
I. Judgment Notwithstanding the Verdict
A.Standard of Review
Massachusetts Rule of Civil Procedure Rule 50(b) provides that a party who previously moved for a directed verdict “at the close of all the evidence” may move for judgment notwithstanding the verdict within ten days of judgment. Mass.R.Civ.P. 50(b). “When acting on a defendant’s motion for judgment notwithstanding the verdict, the judge’s task, ‘taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.’ ” Tosti v. Ayik, 394 Mass. 482, 494 (1985), quoting Rubel v. Hayden, Harding & Buchanan, Inc., 15 Mass.App.Ct. 252, 254 (1983). The court will consider “whether anywhere in the evidence from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the non-moving party.” Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 438 (1992) (internal citations omitted). ‘The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture.” Id., quoting McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 706-07 n.3 (1990).
B.The Record Supports a Waiver by Defendants
Simply stated, the record reveals that Defendants failed to move for directed verdict on the issue of whether the transfer of the Plaintiff was a materially adverse action.
Under Mass.R.Civ.P. 50(a), a pariy may file a motion for directed verdict at the close of all the evidence, which motion “shall state the specific grounds therefore.” Such a motion is a necessary predicate to the later assertion of a right to entry of judgment notwithstanding the verdict.
Motion for Judgment Notwithstanding the Verdict
Whenever a motion for a directed verdict made at the close of all evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the motion for a directed verdict. (Emphasis added.)
The Supreme Judicial Court has held the motions for judgment notwithstanding the verdict may be considered “only when a motion for directed verdict has been made at the close of evidence.” Bonofiglio v. Commercial Union Ins. Co., 411 Mass. 31, 34 (1991); Martin v. Hall, 369 Mass. 882, 884-85 (1976) (Rule 50(b) motion requires motion for directed verdict at the close of all evidence and similar motion filed at the close of the plaintiffs evidence is insufficient).
C.Even Were the Issue Not Waived, Defendants Are Still Not Entitled to Judgment Notwithstanding the Verdict
The Defendants contend that they are entitled to judgment notwithstanding the verdict because the transfer of Ms. Kelley was a “lateral” transfer and thus did not amount to a material adverse action. The jury found to the contrary. Simply put, it is unavailing for a defendant to argue that there was evidence warranting a contrary finding by the jury. Tosti, 394 Mass. at 494, quoting Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., 381 Mass. 1, 4 (1980). The court may not substitute its judgment for that of the jury. Id. If a jury *183 “could reasonably have arrived at their verdict from any of the evidence that the plaintiff presented,” the verdict will be sustained. Dartt v. Browning-Ferris Indus., 497 Mass. 1, 16 (1988), quoting Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997).
A review of all the evidence presented at this lengthy trial satisfied this Court that there was ample showing of a “combination of circumstances” from which the jury was warranted in finding the transfer to be the materially adverse product of retaliatoiy animus.
As of January 2006, the Plaintiff had been employed by the Department of Conservation and Recreation as a clerk in the Sign Shop, a job she had performed quite well by all accounts. Her workplace was located very close to her home and she began her workday at 6:30 a.m.
The position in the Sign Shop was particularly well-suited to and desirable for Ms. Kelley as she has very limited education (seventh grade level) and no computer skills. She did, however, possess skills that were well-suited for her duties in the Sign Shop, and she performed her required functions confidently. Without doubt, her prospects were limited, as she well knew, and she was thus content that she had found her career fit over the ten years in the shop. (While she had at one time applied to have her Sign Shop Clerk position upgraded to that of an Administrative Assistant I, her request was denied by the Defendants on the basis that her skills were not commensurate with that level.)
Prior to January 2006, over a period of more than a year, the climate in the Sign Shop underwent a change when a co-worker and a supervisor began to engage in an overt romantic relationship in the Sign Shop. In addition to making the Plaintiff and others uncomfortable, the relationship resulted in blatant favoritism of the involved co-worker by the subject supervisor.
On January 19, 2006, the Plaintiff, while speaking with her indirect supervisor, James Griffin (“Griffin”), reported to him that the supervisor/co-worker relationship was making her uncomfortable and interfering with her ability to do her job. Griffin then discussed the Plaintiffs complaint with several other higher level employees of the Defendants. During this discussion, Griffin raised a three-year-old issue about Plaintiff and her use of overtime, an issue long since resolved. Griffin then reported the Plaintiffs complaint to Johanna Zabriskie (“Zabriskie”), DCR’s Human Resources Director, who spoke with Plaintiff and initiated a sexual harassment investigation.
On or about January 28, 2006, members of the Sexual Harassment Team showed up at Plaintiffs workplace unannounced for the purpose of interviewing her about her complaint. While upset that they had chosen to appear at the job site rather than a more private, appropriate setting, Ms. Kelley consented to participate in the interview (in a vehicle outside the shop).
During the investigative period, the supervisor was under an order to stay away from the Sign Shop; however, Ms. Kelley continued to see him on the premises. In addition, the coworker was given an e-mail summary of the Plaintiffs complaint and ordered to keep it confidential. That instruction notwithstanding, copies of the e-mail found their way to a variety of places throughout the shop. This activity so upset the Plaintiff that she left on sick leave on February 16, 2006.
On March 16, 2006, Defendants issued their findings in connection with the Plaintiffs complaint, finding that the supervisor and co-worker had engaged in conduct that was “inappropriate and detrimental to the workplace . . . such that [it] may have the effect of creating a workplace that is detrimental and offensive to other employees.”
On March 19, 2006, the Plaintiff sent a letter to the Defendants, complaining that various aspects of her complaint had not been addressed by the findings, expressing that she was “appalled at having been accused of being in ’’cahoots" with her supervisor Chris Bagley who had also filed a complaint, and stating that she was considering filing a complaint with MCAD.
On March 20, 2006, Ms. Kelley returned to work from sick leave. Within a few days of her return, she was informed that she was to take only a half-hour lunch going forward — this despite the fact that for many years she had foregone her breaks in order to take an hour lunch. Her starting time was ordered to be changed from 6:30 a.m. to 7:00 a.m. (She had started at 6:30 a.m. in order to be available to take calls from co-workers and others.) These schedule changes affected only her; no one else in the Sign Shop experienced any schedule change.
On March 23, 2006, Ms. Kelley was instructed to report to take a refresher course in payroll (ordered by Griffin), despite the fact that, according to Kelley, she no longer performed payroll functions at the shop. These incidents so affected Ms. Kelley that she left work upset and went back on sick leave.
On March 28, 2006, Griffin e-mailed Zabriskie stating that Ms. Kelley “has arbitrarily decided that she works in a hostile work environment. Despite recent events there is no basis in fact for her claim. As a result, I am requesting that she be transferred out of the sign shop immediately.”
On March 30,2006, Ms. Kelley received a telephone message from Zabriskie requesting that she come in for a meeting to discuss the matters raised in Ms. Kelley’s March 19th letter. Relying on the substance and tone of the message, Ms. Kelley attended the meeting by herself, where, the jury could have found, within minutes, she was totally blind sided by being *184 handed a notice of her transfer effective April 10,2006. 'While Ms. Zabriskie’s professed reason for the transfer was to make the Plaintiff more comfortable, prior to March 31, 2006, Ms. Kelley had never been consulted about a potential transfer, and certainly had never been asked if a transfer would make her more comfortable.
Although the Defendants contend that this was a lateral transfer, and thus not a materially adverse action, that characterization could have been, and clearly was, rejected by the jury. From the evidence, the juiy was warranted in finding that the Plaintiff was being transferred to an Administrative Assistant position; a position which by definition required skills greater than those possessed by the Plaintiff, and for which in the past she had been deemed unqualified by the Defendants. This position also involved a different location with a longer commute, a different schedule and differentjob duties.[3] Itrequired Ms. Kelley to leave a job she had loved and felt confident in and move to a setting where she would be in fear of failing.
Finally, whether or not the transfer was considered to be a lateral move, based on the evidence the juiy nonetheless could have found that Ms. Kelley’s transfer constituted an adverse job action. See College-Town v. MCAD, 400 Mass. 156, 160 (1987), where the complainant Rizzi alleged harassment in the workplace under G.L.c. 15IB. In response, the employer transferred the employee to a “similar position in a nearby facility.” Id. This was done in order to reduce the “tension” in the workplace that arose from Rizzi’s complaint. Id. The Supreme Judicial Court held that the mandatory transfer, which by eveiy indication was a lateral transfer, constituted actionable retaliation. Id., at 168-69.
Defendants have argued that College-Town addressed a termination rather than a transfer. However, College-Town affirmed the decision of the MCAD, Rizzi v. College Town, Inc., 1984 Mass.Comm.Discrim. Lexis 50. That decision held that both the mandatory transfer and the discharge were retaliatory actions. Id., at 27-28. Specifically, the MCAD found that “the offer of transfer was in itself a retaliatory act” Id., at 29 n. 11 (emphasis added).
The employer in that case, as in Ms. Kelley’s case, sought to transfer the complainant to reduce tension in the workplace raised by the harassment complaint. Id., at 28. The MCAD noted that if an employer could “transfer . . . with impunity individuals who complain of harassment. .. [t]his, of course, is just the opposite of what the statute intended and would undercut any deterrent effect the law . . . might have.” Id., at 28-29. The Supreme Judicial Court agreed, and affirmed that the mandatory transfer was separately and independently actionable. College-Town, 400 Mass. at 169 (“both the transfer and the discharge were in retaliation for [the employee’s] allegations of sexual harassment”).
Similarly, in Alvarez v. Lowell, 2011 Mass.App. Unpub. Lexis 1332, 3-4, 7, a Rule 1:28 decision of the Appeals Court, a police officer alleged retaliation under c. 15 IB. The officer claimed, among other things, that the decision to reassign him to patrol a less desirable sector of the city, in order to keep the officer away from an alleged harasser, was an adverse action. Alvarez, 2011 Mass.App. Unpub. Lexis 1332, at 7 & n.3. The Appeals Court held that the juiy was entitled to view this reassignment as an adverse action. Id.
Job transfers are reviewed under the “totality of circumstances” to determine whether they are adverse in character, even if a transfer fails to result in loss of pay or benefits. Thomas v. Suffolk County Sheriffs Dept. 1998 Mass.Comm.Discrim. Lexis 95, 14, 21-22 (1998) (lateral transfer found to be adverse, even in the absence of loss or pay rank, or disadvantageous shift change, where there was unusually short notice, and disparaging comments uttered at the time of transfer), reversed with respect to dismissal of co-complainant’s case, sub norm Farricy v. Suffolk County Sheriff's Dept. 2000 Mass.Comm.Discrim. Lexis 47 (even threat of transfer is an adverse action).
The totality of the circumstances surrounding Ms. Kelley’s transfer as revealed by the evidence amply supports the jury’s decision that her transfer amounted to an adverse employment action motivated by retaliatoiy animus.
II. Remittitur/New Trial
The Defendants have moved, pursuant to Mass.R.Civ.P. 50[4] and 59, for Remittitur of Damages or, in the Alternative, a New Trial.
Rule 59(a) states in pertinent part: “A new trial may be granted to sill or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by juiy, for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the Commonwealth; ... A new trial shall not be granted solely on the ground that damages are excessive until the prevailing party has first been given an opportunity to remit so much thereof as the court adjudges is excessive . . .”
In the case of Bartley v. Phillips, 317 Mass. 35 (1944), the court described the circumstances that will justify the grant of a new trial on the ground of excessive or inadequate damages as “when the damages are so great . . . that it may be reasonably presumed that the jury, in assessing them, did not exercise a sound discretion, but were influenced by passion, partiality, prejudice or corruption. [Citations omitted.] Somewhat similar is the rule laid down for granting a new trial because contrary to the weight of the evidence in general, namely, that the verdict must be ‘so greatly against the weight of the evidence as to induce in [the judge’s] mind the strong belief that it was not due to a careful consideration of the evidence, *185 but that it was the product of bias, misapprehension or prejudice’ ...
“But the rule may equally well be stated more briefly. The ‘fundamental test’ is ‘that such motions ought not to be granted unless on a survey of the whole case it appears to the judicial conscience and judgment that otherwise a miscarriage of justice will result.’ ” at 41.
‘The question whether a new trial should be granted for excessive or inadequate damages or for other reasons is within the ‘discretion’ of the trial judge.” Id. at 42. “(A]n award of damages must stand unless to . . . permit it to stand was an abuse of discretion . . . amounting to an error of law.” Id. at 43. “ ‘Discretion,’ in this connection does not mean wilful or arbitrary decision. The ‘discretion’ meant is ‘judicial discretion,’ which ‘imports the invocation by a clear and trained mind of reason, courage, impartiality and conscience to accomplish in a calm spirit a result in conformity to law and just and equitable to all parties.’ ” Id. at 42.
As in their related motions, the Defendants argue in support of Remittitur/New Trial that the Plaintiff did not suffer an adverse action in her “lateral” transfer. For that reason, the Court is unclear whether they are seeking Remittitur of the compensatory damages (or merely a new trial on that issue). For this reason this Court will address all areas of damages.
A. Compensatory Damages
' On a motion for remittitur, a Court may disturb an award of compensatory damages only if it was unsupported by substantial evidence in the record such that it is “greatly disproportionate to the injury proven or represented a miscarriage of justice.” Labonte v. Hutchins & Wheeler, 424 Mass. 813, 825 (1997).
Remittitur of the compensatory amount of $139,000 would only be appropriate if the Court should accept the Defendants’ claim that the transfer of the Plaintiff did not constitute an adverse action, and found that the jury had erred in this regard. This Court has examined that issue earlier in this decision and need not repeat the reasons why the compensatory damages award will not be disturbed.
B. Emotional Distress Damages
The Defendants claim that the jury’s award of $500,000 in emotional distress damages was grossly disproportionate to the injury. They deprecate the Plaintiffs case on this issue as “only the self-serving evidence of Ms. Kelley and her family, that she was fully incapacitated for years solely as the result of the transfer.” While it was true that the evidence on the issue of Plaintiffs emotional distress consisted of her own testimony and that of her husband and two sisters, that evidence was exceptionally detailed and showed that the depth and breadth of the emotional impact on Ms. Kelley far exceeded any “garden variety” emotional distress. Very briefly, the evidence that the jury was warranted in accepting demonstrated the following.
Following the transfer, Ms. Kelley could not return to work, and her absence was supported by letters and notes from her health providers. Ms. Kelley started seeing a therapist for the first time in her life in the week before the transfer, and after the transfer she sought therapy well over a hundred times up through 2010. She suspended therapy only when her insurance ceased covering the visits, and she could not bring herself to entertain the thought of starting over with a new therapist. Ms. Kelley took medications for her anxiety and depression for the first time in her life. She thus attempted to mitigate her emotional harm by seeking the help of a therapist for years, taking medications in addition to intentionally avoiding DCR people and properties that were likely to upset her.
Ms. Kelley suffered anxiety about the financial future of her family because of her inability to work. She felt betrayed by the entire experience surrounding her transfer, and she viewed it as unfair that she was transferred while the wrongdoers were not. She did not feel safe to return to employment with DCR. Because of these trust issues, Ms. Kelley prevented her husband from taking a promotion at DCR that would result in the loss of his union protection, leading to a further threat on their financial security. Her normally upbeat, socially engaged demeanor was replaced by a constant sadness and depression that led her to isolate herself from close family members and the many activities she had enjoyed. The testimony of her husband and her sister Susan Morrissey were particularly coherent and compelling regarding the ways in which she had changed since the transfer, and was now only recently beginning to re-engage with family and resume activities.
Q. And you’ve just testified that you think that Ms. Kelley is slowly becoming better?
A. Well, she walked with me three days in a row. She wouldn’t have done that two years ago. A year and a half ago, I went out — she came out to Marshalls with me and I bought a chair and she carried it to the front. That’s baby steps. That’s baby steps.
Q. I understand. You care about your sister very much obviously.
A. I love my sister very much.
Q. And you’d like to see her succeed at this trial, wouldn’t you?
A. You know what I’d love? I’d love for my sister to be my sister that she was seven years ago. That’s what I’d love. I’d love for my sister to feel good inside, the fibers of her body, and not to feel like she feels. That’s what I’d love. The trial? Whatever. I want my sister back. I want my sister to feel better.
(S. Morrissey cross examination 5-114 — 5-115.)
There was no miscarriage of justice in the juiy’s award for the Plaintiffs emotional distress.
*186 C. Punitive Damages
Generally, trial courts are required to review punitive damage awards to assure that they are not excessive or irrational in light of three factors: (1) the degree of reprehensibility; (2) the ratio of the punitive damage award to the “actual harm inflicted on the plaintiff”; and (3) the comparison with civil or criminal penalties that could be imposed for comparable misconduct, Labonte, 424 Mass. at 826-27; Bain v. City of Springfield, 424 Mass. 758, 765 (1997); Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 109 (2009).
The juiy was instructed in full on the issue of punitive damages and found that an award was warranted. (‘Was the defendants’ conduct toward Jeannie Kelley outrageous based on malice, evil motive or reckless disregard or indifference to the plaintiffs rights?” Answer 4: Yes.”)
While this Court has no intention of recounting again the relevant evidence, there was ample direct and circumstantial evidence to support the juiy’s affirmative answer to the special verdict question as well as the award of $250,000 in punitive damages.
Although the Defendants would have preferred that the juiy draw different inferences and make different findings on the basis of the words, e-mails and acts of the various Commonwealth employees, the fact that different findings could have been made does not warrant this Court’s substituting its judgment for their collective deliberative judgment. Tbe juiy had an opportunity to assess the demeanor and credibility of each of the Defendants’ employees who had a hand in (1) the investigation of Ms. Kelley’s initial complaint and the action taken in response to it; (2) the treatment of Ms. Kelley’s March 19, 2006 complaint; and (3) the decision to transfer her. The jury, based on the evidence, was free to accept or reject their explanations for their various actions and to determine their motivations. Having done so, the Court concludes that the jury was warranted in arriving at the figure it did based on the conduct of the parties. Accordingly, the punitive damage award in the amount of $250,000 will stand.
CONCLUSION
For the foregoing reasons:
(1) Defendants’ motion for judgment notwithstanding the verdict is DENIED.
(2) Defendants’ motion for remittitur or, in the alternative, for a new trial is DENIED.

While these matters are addressed in separate motions, this Court has consolidated them in this Memorandum of Decision. A motion by Plaintiff for attorneys fees and costs is the subject of a separate decision.

The Court regrets the delay occasioned by several absences from the Court due to illness.

Of note is evidence that the position had been unfilled for some time and remained unfilled for years after Ms. Kelley left.

This Court will not discuss the motion for JNOV under Rule 50 separately as the standards for entry of same are set forth above.